1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

10

| | |
|---|---|
| TONY M. SMITH, | |
|     *Petitioner*, | 3:06-cv-00087-ECR-VPC |
| vs. | ORDER |
| E.K. MCDANIEL, *et al.*, | |
|     *Respondents*. | |

11
12
13
14
15

16    This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on

17  the merits on the remaining claims.

18                                               ***Background***

19    Petitioner Tony Smith seeks to set aside his July 6, 1999, conviction, pursuant to a jury

20  verdict, of first degree murder, robbery, conspiracy to commit robbery, and burglary.

21  Following a penalty phase trial and adjudication as a habitual criminal, Smith was sentenced

22  to three concurrent terms of life without the possibility of parole and an additional term of life

23  without the possibility of parole consecutive to the three concurrent life sentences.[1]

24    The Supreme Court of Nevada summarized the evidence from the trial of Smith and

25  his co-defendant Robert Rowland in its published decision on the co-defendant's appeal in

26  *Rowland v. State*, 118 Nev. 31, 39 P.3d 114 (2002).  The state high court's decision, with the

27  ─────────────────

28    [1]See #59-8, Ex. 166.

1    exception noted below in brackets, substantially accurately summarized evidence that was

2    presented in the joint trial, including the following:

3          . . . Robert Ryan Rowland and co-conspirators, who were
part of a prison gang known as GFBD ("God Forgives, Brothers

4          Don't"), murdered and robbed Nevada State Prison inmate
Steven Bruce Silva on January 19, 1998.  Rowland was tried with

5          one of the co-conspirators, Tony Martin Smith. . . . .

6                         . . . .

7          A jury trial commenced on April 15, 1999.   Two of
Rowland's co-conspirators were not tried for Silva's murder, Juan

8          Pedro LaPeire and Ricky Irvine.   LaPeire pleaded guilty to
conspiracy to commit grand larceny, for which he was sentenced

9          to time served, and then testified for the State at the trial of
Rowland and Smith.  Irvine testified at the grand jury hearing, but

10          was dismissed from the case when he committed suicide in his
cell after a local newspaper had revealed that he had testified.

11

12          On January 19, 1998, inmate Silva was found badly beaten
in his cell.  Paramedics transported Silva to the Carson-Tahoe

13          Hospital, where he died from multiple injuries of blunt-force
trauma.

14          Officer Rod Moore, who began investigating the crime
shortly after its occurrence, heard that Irvine had exhibited some

15          strange behavior after the incident and had claimed to know who
committed the crime.   During an interview Irvine told Officer

16          Moore, "I know who did it," and told him to "go check [Rowland's]
hands." Officer Moore visited Rowland and without telling him why

17          he was checking his hands, Officer Moore observed that his
knuckles were red, but saw no abrasions.

18

19          Officers conducted a search of the entire unit and found
evidence connecting the four suspects to the crime.  In Silva's

20          cell, a note saying "expect no mercy" from an unidentified writer
was found.  Inmate LaPeire, Rowland's cellmate, testified that he

21          believed that this note was in Rowland's handwriting. A Walkman
and a television set, which belonged to Silva, were found in

22          Irvine's cell.  A fan, allegedly belonging to Silva, was found in
Smith's cell. [No competent evidence that the fan was Silva's was

23          presented, see 27-29, *infra*.  This is a recitation on *Rowland's*
appeal.]  Gloves were found in both Rowland's and Smith's cells.

24          No guards witnessed what happened to Silva, but several
inmate witnesses testified regarding the events.  LaPeire testified

25          that he went to a meeting in Smith's cell the night before the
murder to plan the attack on Silva with Rowland, Smith, and

26          Irvine. According to LaPeire, Rowland and Smith were upset with
Silva because Silva would not give his methadone pills to them.

27          LaPeire served as a lookout during the attack and helped carry
Silva's property after the incident.   After the attack on Silva,

28          LaPeire told the investigators that he and Rowland were in their

cell the entire time, but he later confessed, asserting that Rowland concocted this lie for him.

Inmate Rick Ebel, Silva's cellmate testified that he was in Silva's cell when Rowland, Smith, and Irvine kicked in the door and told Ebel to "[g]et out." Ebel stated that he jumped out of the cell but stood next to the doorway to observe what was happening.  Meanwhile, Ebel heard Rowland tell Silva, "[y]ou're getting taxed, mother-fucker." Ebel testified that Rowland punched and Smith kicked Silva while Irvine stuffed Silva's property in a laundry bag.  Ebel stated that after the attack, inmate David Baker came over from a nearby cell to administer CPR on Silva while Ebel sought help.  Ebel also went to the cell where Rowland, Smith, and a third person were talking and told them, "I think he's dead," to which either Rowland or Smith responded, "[w]ell just keep your mouth shut." Ebel admitted that he denied any involvement for months until he was put in solitary confinement for six or seven months as a result of the crime and his suspected involvement.  He also admitted that he had a reputation as a big mouth and admitted that part of his motive for testifying was that he was a suspect, and he wanted to avoid being charged with the murder.

Inmate Richard Williams Watson, who lived in the cell across from Silva's, testified that he saw Rowland punching Silva while wearing gloves, Smith holding a laundry bag of Silva's belongings, and heard Rowland yell to Baker that "he might be dead." Watson admitted that he did not tell the whole story when he was first interviewed by investigators.  In exchange for his testimony, the prosecution wrote letters to the parole board on his behalf and he received a 90-day credit toward his sentence. After Watson agreed to testify, Rowland attacked him on a prison bus on April 1, 1998, and threatened to cut his throat if he testified.

Inmate James Reid testified that on the day of the murder, he was making a phone call in the unit where the murder occurred, and from that vantage point, he could see the area where Silva's cell was located.  Reid stated that he saw Smith, Irvine, and LaPeire leaving Silva's cell carrying property in laundry bags.  Reid also saw Rowland exiting Silva's cell carrying a shirt. Reid admitted that he had lied to the investigators the first two times he was interviewed because he was afraid of the consequences he might suffer if he was labeled a "snitch."

Inmate Timothy Wade, Silva's former cellmate, testified that he was using the phone in Unit 6 when the attack on Silva occurred.  Wade saw Smith and Rowland enter the rotunda on the way down to Silva's cell and Smith yelled to Wade, "mind your own business," which was picked up on the prison telephone recording system.  Wade went to Smith's cell and while Smith was cleaning himself off, Smith told Wade that if Silva paid his debts he could get his stuff back and he retorted to Wade that, "[y]ou don't even like that dude." After providing investigators with information about the crime, Wade said that GFBD members

attacked him in the prison yard. Initially, Wade refused to speak with investigators, but agreed to testify only if he was provided protection.

Inmate Ricky Egberto testified that when he was in the prison infirmary with Smith and Rowland six weeks after the murder, Smith and Rowland admitted that they had beaten Silva over a drug debt and that Irvine was going to take the blame. Inmate David Springfield testified that on the day of the murder he saw Rowland leave Silva's cell red-faced with gloves on and saw Smith and Irvine carrying items out. Inmate Allen Clingempeel testified that after Irvine committed suicide, Smith, with Rowland present, told Clingempeel to say that Irvine confessed to the murder.

Rowland did not set forth any affirmative defenses and chose not to testify at trial. Instead, Rowland chose to hold the State to its burden of proof. Thus, Rowland's defense consisted primarily of attacking Watson's credibility by offering testimony of several officers who stated that Watson had failed to alert them to any possible trouble with Rowland, contrary to Watson's testimony.

On the other hand, Smith's defense was that he was not at the scene when the crime occurred. Smith chose to testify. In addition, inmates Ronnie Johnson[,James Schultz,] and Jason Jones testified as to Smith's alibi. Specifically, Johnson [as did Schultz] testified that at the time of Silva's attack, Smith was with him near the handball courts after he had just been to the visiting area to see his ex-wife and son. Jones testified that he witnessed the attack but that he did not see Smith present at the time of the attack. The State discredited Jones's testimony with rebuttal witness inmate Richard Scott, who testified that Jones was playing cards with him during the attack on Silva.

On May 4, 1998, the jury returned guilty verdicts against Rowland and Smith for first-degree murder, robbery, burglary, and conspiracy to commit robbery.

. . . . .

The penalty hearing began on the following day and Rowland filed a motion to dismiss the jury or at least take a two-week hiatus before proceeding with the penalty phase because some of the jurors expressed concern for their safety. The district court denied the motion.

At the penalty hearing, Smith elected not to testify. However, Rowland chose to testify and admitted hitting Silva but denied intending to kill him.

After weighing the various mitigating and aggravating circumstances, the jury rejected the death penalty, imposing a sentence on both Rowland and Smith of life without the possibility of parole. . . . .

1   *Rowland v. State*, 118 Nev. at 35-38, 39 P.3d at 116-18.[2]

2                       ***Governing Standard of Review***

3         The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

4   deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333

5   n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

6   review, a federal court may not grant habeas relief merely on the basis that a state court

7   decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

8   2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if

9   the decision: (1) was either contrary to or involved an unreasonable application of clearly

10  established federal law as determined by the United States Supreme Court; or (2) was based

11  on an unreasonable determination of the facts in light of the evidence presented in the state

12  court.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

13        A state court decision is "contrary to" law clearly established by the Supreme Court only

14  if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

15  if the decision confronts a set of facts that are materially indistinguishable from a Supreme

16  Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

17  124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

18  because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

19  held that a state court need not even be aware of its precedents, so long as neither the

20  reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

21  not overrule a state court for simply holding a view different from its own, when the precedent

22  from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 17, 124 S.Ct. at  11.

23  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

24  Court precedent is not contrary to clearly established federal law.

25

26  _____

27        [2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of the
    state court evidence.  It quotes the Nevada Supreme Court summary and/or summarizes additional evidence
    over the course of this order solely as background to the issues presented in this case.  No statement of fact

28  made in describing testimony or other evidence constitutes a finding of fact by this Court.

1    A state court decision constitutes an "unreasonable application" of clearly established

2  federal law only if it is demonstrated that the state court's application of Supreme Court

3  precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.,*

4  *Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

5    To the extent that the state court's factual findings are challenged intrinsically based

6  upon evidence in the state court record, the "unreasonable determination of fact" clause of

7  Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d

8  943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly

9  deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied

10  by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

11  Rather, the AEDPA requires substantially more deference:

12    . . . . [I]n  concluding that a state-court finding is unsupported by
       substantial evidence in the state-court record, it is not enough that
13    we would reverse in similar circumstances if this were an appeal
       from a district court decision. Rather, we must be convinced that
14    an appellate panel, applying the normal standards of appellate
       review, could not reasonably conclude that the finding is
15    supported by the record.

16  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.  If

17  the state court factual findings withstand intrinsic review under this deferential standard, they

18  then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may

19  be overturned based on new evidence offered for the first time in federal court, if other

20  procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

21    The petitioner bears the burden of proving by a preponderance of the evidence that

22  he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

23                              ***Discussion***

24  **Ground 1:  Prosecutorial Misconduct  – Misleading Evidence & Argument**

25    In the remaining claims under Ground 1, petitioner alleges that he was denied rights

26  to a fair trial and due process in violation of the Fifth and Fourteenth Amendments when the

27  prosecutor elicited misleading testimony regarding prison "turnarounds" -- a procedure

28  pertaining to prisoner movement -- and misstated the evidence regarding turnarounds.

1    Smith, Rowland, and the victim Silva all resided in Unit 6, and Silva was murdered in

2    his cell in Unit 6.  Freedom of movement was a point of contention because Smith raised an

3    alibi defense asserting that he was in a different part of the prison at the time of the murder.

4    He maintained that he was outside the unit at the relevant time and could not return except

5    during a turnaround period.  The State maintained that the attack occurred at or after 3:00

6    p.m. that afternoon.  Smith asserted that he was in the visiting room with family until 2:20 p.m.

7    and that he remained in the lower yard thereafter.  According to Smith, he could return to Unit

8    6 only during designated turnaround periods in which inmates were allowed to move from the

9    yards into the units.

10    The inmates were housed in Nevada State Prison, which at that time was a medium

11    security prison.  The facility previously had been a maximum security facility, such that it

12    retained security features for that type of facility.  The terrain upon which the prison is built

13    includes a hill.  This hill serves as a natural divider of the prison grounds into a "lower yard"

14    and "upper yard," with the latter also being referred to "up the hill" or "up on the hill."  The

15    visiting room was in the lower yard along with a number of other facilities.  The general

16    population units, including Unit 6, were in the upper yard area of the prison along with a

17    number of other facilities, with the upper yard units also being referred to as "hill units."[3]

18    Unit 6 was composed of four wings, designated as A, B, C and D.  Each wing consisted

19    of an upper and lower tier with six double-bunked cells each.  The twelve cells for each wing

20    therefore had a maximum capacity of 24 inmates, for a total capacity for the unit of 96

21    inmates.  The lower-tier cells on a wing were numbered 1 through 6, and the upper-tier cells

22    were numbered 7 through 12.[4]

23    Inmates entered the unit through a front entrance and sally port, *i.e.*, two gates capable

24    of being locked and controlled from the control unit.  Once through the sally port, the inmate

25    would be in the rotunda.  The inmate then would enter the individual wings, depending upon

26

27    [3]#44, Ex. 119, at 16-24, 31 & 70-71 (then-Associate Warden David Meligan).

28    [4]*Id.*, at 24 & 52-54.

-7-

1   the access rules in force at the time, through doors to the wings.  The control unit or "bubble"

2   for the unit was located in the unit rotunda.[5]

3       Once through the wing door, the inmate would be standing in another rotunda area for

4   the wing.  Two stairwells led to the two tiers, with one going up to the upper tier and the other

5   down to the lower tier.  An individual standing in the wing's rotunda could see both levels.

6   Each wing had a pay phone and a shower area.[6]

7       At the time, a single correctional officer would occupy the control unit, and the officer

8   could operate the door locks with a control panel.  The officer could see into the wings

9   through a combination of direct line of sight and cameras.  However, the officer could not see

10  everything that was occurring in the wings and/or cells.  The officer would perform a walk

11  through or unit tour of the four wings at least three times during an eight hour shift.[7]

12      At the relevant time, within Unit 6, Silva lived in cell B-2, *i.e.*, the second cell on the

13  lower tier in B wing.  Smith and Rowland both lived in C wing.  The Unit 6 cameras did not

14  provide a view to the inside of cell B-2.[8]

15      Given that the prison was a medium security facility, inmates were allowed some

16  freedom of movement inside the institution.  However, as noted, the degree and timing of that

17  movement was a point of contention at trial.

18      The State's case-in-chief included the following testimony regarding inmate movement

19  at the time of the offense and the timing of events on the day of the murder.

20      David Meligan testified as follows.  At the relevant time, Meligan was Associate

21  Warden of Operations at the prison.  In this capacity, he was the overall chief of security,

22  which meant that he supervised the day-to-day operations of the prison and its custody staff.

23

24      [5]*Id.*, at 50-53 & 76-77

25      [6]*Id.*, at 54-55 (Meligan); #45, Ex. 120, at 10 (Correctional Officer Stacy Miller).

26

27      [7]#44, Ex. 119, at 32-33, 50-52, 65, 72-74, & 85-86 (Meligan); #45, Ex. 120, at 16-18, 23-24 & 35-37
    (Miller); *id.*, at 73 (Correctional Officer Kenneth Bynum).

28      [8]#44, Ex. 119, at 55-57 & 74 (Meligan).

-8-

1  Every security officer in the institution answered ultimately to him.  Meligan was the officer

2  who signed the institutional procedure documents that were discussed during his testimony.[9]

3          General population inmates were not allowed to enter other general population units,

4  such that, for example, a Unit 6 inmate was not allowed to enter Unit 7.  At the time of Silva's

5  murder, however, inmates within a general population unit were allowed to go freely from one

6  wing of the unit to another until the 8:00 p.m. count, such that, for example, an inmate living

7  in C wing of Unit 6 could freely go into B wing.[10]

8          Under the normal procedure, an inmate could enter or leave a unit only by the unit

9  control officer electronically opening the two sally port gates at the front entrance to the unit,

10  first one, then the other.  However, if the gates were not secured and/or the locks were not

11  functioning properly, the gates would be left open, and inmates could enter and leave the unit

12  more freely, depending upon the unit officer.[11]

13          Inmates from the general population hill units could enter the lower yard, through a

14  gate that was left cracked open during regular operations, only for specific reasons, such as

15  to go to the visiting area or to participate in a program.  An officer would stop the inmate and

16  question him as to where he was going, and the officer then would watch to ensure that the

17  inmate went to where he said that he was going.  If an inmate went to the lower yard for a

18  specific purpose, such as visiting, he was not supposed to remain in the lower yard after he

19  finished.[12]

20          Shortly after Silva's murder, on January 21, 1998, the prison adopted a new

21  institutional procedure.  Under the new institutional procedure, visiting from one wing to

22  another within a general population unit no longer was permitted.  #44, Ex. 119, at 30-31.

23          / / / /

24

25          [9]#44, Ex. 119, at 15-16, 27 & 30.

26          [10]*Id.*, at 28-30, 53-55 & 74-75; see also #45 , Ex. 120, at 43 (Correctional Officer Miller).

27          [11]#44, Ex. 119, at 32-33, 50-52, 66-67 & 76-77.

28          [12]*Id.*, at 22-23, 28-29, 31-32 & 75-76.

-9-

1      Meligan testified as follows regarding turnarounds.  A turnaround policy restricted

2   inmate movement outside the units and in the yards to specific designated intervals.  The unit

3   gates and yard gates would be secured such that inmates could not move about freely.

4   According to Meligan, a formal turnaround policy was not in effect in January 1998, such that,

5   prior to Silva's murder, general population inmates could come and go freely.  According to

6   Meligan, a formal turnaround policy was adopted approximately six months after the murder,

7   on July 27, 1998.  Under that policy, general population inmates could enter and leave the

8   units only during turnarounds conducted at thirty-minute intervals.  At trial, the defendants did

9   not object to either the testimony or the exhibit with the July 27, 1998, policy.[13]

10     Correctional Officer Stacy Miller testified as follows.  She had been a correctional

11  officer for approximately seven months at the time of Silva's murder.  On that day, she was

12  the control or "bubble" officer for Unit 6 for the shift that ran from approximately 8:00 a.m. to

13  4:00 p.m.  Miller testified, substantially consistent with then-Associate Warden Meligan's

14  testimony, that inmates could move freely between the wings at the time of Silva's murder,

15  that the policy was changed after his murder to prohibit moving between the wings, that

16  inmates could not go to other general population units, and that Unit 6 inmates were not

17  supposed to be in the lower yard except for a specific reason such as visiting.  She testified

18  that an inmate could walk from one part of the unit to another in twenty seconds or less.[14]

19     Officer Miller testified that, at that time, both the inner and outer sally port doors at the

20  front entrance to Unit 6 remained open at all times during the day.  Inmates could come and

21  go at will without signing in or checking in with the control officer.  They could go out into the

22  upper yard, but not the lower yard, for yard time.[15]

23     With regard to turnarounds, Miller testified, similar to Meligan, that a formal turnaround

24  policy, which provided for turnarounds at thirty-minute intervals, was not adopted until a time

25  _____

26     [13]#44, Ex. 119, at 60-62 & 67.

27     [14]#45, Ex. 120, at 8-13, 20-22, 30, 34, 43 & 46-47.

28     [15]*Id.*, at 21-22.

1   subsequent to Silva's murder.  When a turnaround was performed, the gun rail officer would
2   announce the turnaround over the radio, and the turnaround also would be announced over
3   the public address system.  The inmates would have approximately five to seven minutes to
4   move between the units and the yard and then the announcement would go out that the
5   turnaround was over.  All of the hill units performed a turnaround at the same time, and a unit
6   could not perform a turnaround on its own.  She testified that, in January 1998, however, in
7   the absence of a turnaround policy, nothing prevented an inmate from returning to his unit.
8   The defendants did not object to any of this testimony.[16]

9          Officer Miller and Correctional Officer Kenneth Bynum, collectively, testified as follows
10  with regard to the circumstances shortly prior to and after officers were informed that Silva
11  needed attention.  Per standard practice, Bynum came on to relieve Miller about thirty minutes
12  prior to the end of the shift, at approximately 3:30 p.m..  No problems were reported prior to
13  Miller being relieved in the control unit and leaving the facility.  A short time after Miller left,
14  at approximately 3:37 p.m., two inmates came to the bubble and informed Bynum of a "man
15  down."  From inside the control unit, Bynum notified his supervisor and directed a response
16  team to Silva's cell.[17]

17         Then-Sergeant Paul Colbert was a shift supervisor at the prison.   According to
18  Colbert's testimony, the entire prison was locked down at 3:40 p.m. after receiving the man
19  down call.  As of that time, all cell, wing, unit, and yard doors or gates would be closed, and
20  the inmates would be frozen in place.  Any inmates in the lower or upper yards would remain
21  in the yard, and officers would compile lists of all inmates in each yard.  Inmates who were
22  in the upper and lower yards on January 19, 2008, at the time of the lockdown remained there
23  for a considerable period of time thereafter.[18]

24         / / / /

25  _____

26         [16]#45, Ex. 120, at 28-31, 39-40 & 47-51.

27         [17]#45, Ex. 120, at 15, 24, 46 & 52 (Miller); *id*., at 53-58, 78-79 & 89-91 (Bynum).

28         [18]#46-1, Ex. 121, at 16-20, 27-29, 34, 46-47 & 48.

1    Then-Correctional Officer James Merritt testified as follows. He was part of the team
2    that responded to Unit 6 after the man down call. After the unit was secured for the lockdown
3    at 3:40 p.m., he maintained the incident log, which recorded everyone who came into the unit
4    after the emergency was called. Merritt logged, *inter alia*, inmates other than Tony Smith
5    being escorted into the unit at 4:55, 7:05 and 10:20 p.m. Every inmate who was escorted
6    back to the unit was logged; any other inmates who were stuck in place elsewhere were not
7    returned to the unit if they were not logged.[19]

8    Smith's case-in-chief included the following testimony regarding inmate movement
9    generally at the time of the offense and his movements on the day of the murder.

10    Correctional Officer Howard Cutshaw testified as follows. During the day shift on
11    January 19, 1998, he was the control officer for Unit 9, another general population unit on the
12    hill. Cutshaw, referring to his log sheet for that day, testified that turnarounds occurred during
13    his shift on that day at 9:30 and 10:00 in the morning and at 1:32, 2:00, 2:40, 3:02, and 3:30
14    in the afternoon. He would receive a call on the radio from the rail officer announcing the
15    turnaround, and an announcement also would be made on the public address system.
16    According to Cutshaw, inmate movement into and out of the unit was permitted only during
17    the turnarounds, during an approximately five minute period following the announcement.[20]

18    According to Cutshaw, the prison had been doing turnarounds since approximately
19    November 1997, following an escape. He testified that, absent unusual circumstances, it was
20    mandatory that the turnarounds were performed by the general population units at the same
21    time, that it thus would have been unusual for only one of the units to be performing regular
22    turnarounds over the course of an entire day, that any difference in procedure between the
23    units would have been as to whether the turnarounds were logged not as to whether they
24    were performed, and that the turnarounds were being performed prior to the time of the formal
25    July 27, 1998, turnaround policy. #54, Ex. 143, at 86-90 & 94-97.

26    _____

27    [19]#46, Ex. 122, at 5-17 & 24-28.

28    [20]#54, Ex. 143, at 78-84.

-12-

1    Petitioner Tony Smith's testimony included the following.  According to Smith, he left

2 Unit 6 to go down to visit his ex-wife and son at noon.  After entering the lower yard, he

3 remembered that he still had his lighter in his pocket, which he was not allowed to bring into

4 the visiting area.  He stopped at the handball court by the visiting room and left his lighter with

5 Ronnie Johnson.  The visiting log reflected that Smith was called for visiting at 12:14 p.m.,

6 that he arrived at 12:25, and that he left at approximately 2:20, following a strip search.  After

7 he left the visiting room and reentered the lower yard, Smith went over by the handball court

8 and sat on some rocks talking to Ronnie Johnson and James Schultz.  He acknowledged at

9 trial that it was a violation of the rules for him to do so.  At some point, he had to go to the

10 bathroom so he started walking up the hill with Schultz.  He then heard a turnaround being

11 called, and he hurried back to his unit.  Although he was not certain initially, he testified that

12 "the black guy," *i.e.*, Correctional Officer Bynum, was in the bubble when he reentered the

13 unit.  Smith went to his cell to use the bathroom, and then he lay down.  At or around that

14 time, the unit was locked down.  Smith's testimony was vague as to such details as to how

15 long the strip search took and how long he stayed talking in the lower yard thereafter.  But he

16 believed that he returned to the unit from the yard on a 3:30 p.m. turnaround because the

17 guards were coming down the hill at the end of the day shift.[21]

18    Ronnie Johnson and James Schultz provided corroborating testimony as to Smith

19 staying in the lower yard after visiting and talking with them.  Their testimony, too, was vague

20 as to how long Smith remained in the lower yard.[22]  Johnson claimed to have quit the GFBD

21 gang.  However, he had GFBD tattoos on his chest and leg, which he maintained that he was

22 unable to remove.  He further continued to sign and write GFBD sayings on birthday cards

23 to GFBD members; and he unilaterally stated that he watched out for Smith's interests.[23]

24

25    [21]#54, Ex. 144, at 96-101; #55-1, Ex. 146, at 9-15, 37-46, 85-87 & 91-93.

26

27    [22]#54, Ex. 143, at 111-17 & 120-34 (Johnson); *id.*, Ex. 144, at 35 (Johnson); *id.*, at 36-51 & 57-61 (Schultz).

28    [23]#54, Ex. 143, at 118-19, 134-42; *id.*, Ex. 144, at 26-35.

-13-

1    Smith also presented testimonial and documentary evidence that he had been written

2    up on December 15, 1997, for trying to reenter Unit 6 outside of a turnaround.  This evidence

3    tended to support the defense claim that turnarounds were conducted prior to the Silva

4    murder and prior to the July 27, 1998, formal turnaround policy referred to by the State.  The

5    prison disciplinary writeup had not been found when Smith's institutional file was produced

6    in discovery, and the writeup was found only a short time prior to trial.[24]

7    The State's rebuttal case included the following testimony.

8    Correctional Officer Tommy Lynn Bauer testified as follows.  Officer Bauer was the

9    lead officer in the visiting room on the day of Silva's murder.  He testified that the officers set

10   the visiting room clock ten minutes fast so that they could get the visiting room cleared each

11   day by the 2:30 p.m. visiting room closing time.  It would take no longer than five minutes to

12   process an inmate through a strip search after visiting.  An inmate was not allowed simply to

13   leave the visiting room without any direction or supervision.  An officer in the visiting room

14   instead would radio the first gun post that an inmate or specified number of inmates were

15   coming through a tunnel area to go to the general population units.  The first gun post

16   thereafter would radio to the next gun post as the inmate or inmates moved through the tunnel

17   area toward the upper yard.  That gun post then would hold the inmates until the next

18   turnaround before sending them through.  Officer Bauer acknowledged that the prison had

19   been having an unofficial turnaround policy "for a couple of years now," prior to the official

20   written policy in July 1998.  Some officers logged the turnarounds, and some did not, even

21   after the policy was made an official written policy.[25]

22   Correctional Officer Terance Hinson testified as follows.  He was part of the team that

23   responded to the man down call in Unit 6.  He reaffirmed that the unit was locked down at

24   3:40 p.m. and that any inmates who then were outside the unit in a yard would be stuck in the

25   yard.  He was the officer who processed Unit 6 inmates out of the yards after the lockdown.

26   

27   [24]#54, Ex. 144, at 73-76; #55, Ex. 146, at 63; #71, Ex. 291 (Trial Exhibit 188).

28   [25]#55, Ex. 147, at 36-46.

He processed a black inmate named Tony Smith with a different identification number, but he did not process the petitioner out of either the upper or lower yard.  With regard to turnarounds, Officer Hinson testified that inmates returning from visitation were exempted from turnaround limitations on movement, so that they could promptly put away their visiting clothes.[26]

In the State's initial closing argument, the prosecutor challenged Smith's alibi defense, but she did not refer to or rely upon the presence or absence of turnaround procedures.  She instead argued, *inter alia*, that Smith had sufficient time after visiting to make it back to his unit to participate in the attack.  She noted that with the clocks being set ten minutes fast, Smith would have left the visiting room at approximately 2:10 p.m. and that his movements thereafter would have been monitored through to his return to the upper yard, with his prompt return being permitted because he was in his visiting clothes.[27]

In Smith's closing argument, defense counsel took the State to task for an alleged lack of integrity in its presentation of its case, including, in particular, the State presenting allegedly misleading testimony and evidence about turnarounds.  Counsel argued that then-Associate Warden Meligan had misrepresented the truth when he stated that there were no turnarounds at the time of the offense.  He further argued that the State had presented rebuttal evidence that inmates in their visiting clothes were allowed to return outside of a turnaround only after Smith produced evidence that he had been written up for trying to reenter the unit outside of a turnaround prior to the date of the offense.  He maintained that the State's allegedly unfair cross-examination on turnarounds "tells you volumes about the integrity of the State's case, when they attempt to attack on issues that simply aren't true."[28]

In the State's final closing argument, the prosecutor maintained that Meligan had not been lying in his testimony that there was no formal turnaround policy until after the murder.

---

[26]#55, Ex. 147, at 21-32.

[27]*Id.*, at 174-78.

[28]#55, Ex. 148, at 39-41.

-15-

1  She maintained that, prior to that time, some of the unit control officers followed the practice

2  of doing turnarounds and that some did not.  She relied in this regard upon the fact that of

3  Units 3, 6, 7 and 9, only the control officer for Unit 9 logged turnarounds on the date of the

4  offense.  The prosecutor argued that the evidence about visiting inmates being allowed to

5  return to their unit despite a turnaround was proper rebuttal evidence, in that "[y]ou wait until

6  a guy gets up there and lies, and you then you show the truth."[29]

7      On direct appeal, Smith argued that the state district court committed plain error by

8  failing to correct alleged prosecutorial misconduct based upon the State's allegedly

9  misleading evidence and argument concerning turnarounds.

10      The Supreme Court of Nevada rejected the claim on the following grounds:

11          . . . Smith argues that the district court committed plain
          error by failing to cure instances of prosecutor misconduct.
12          Specifically, Smith directs this court to two instances, when the
          prosecutor allegedly misstated Smith's alibi evidence by eliciting
13          testimony that created a "false impression" about turnarounds
          and also when the prosecutor stated in her closing argument that
14          only some of the units were conducting turnarounds.  This court
          may consider sua sponte plain error which affects the defendant's
15          substantial rights, if the error either: "(1) had a prejudicial impact
          on the verdict when viewed in context of the trial as a whole; or
16          (2) seriously affects the integrity or public reputation of the judicial
          proceedings."  We conclude that the prosecutor did not elicit
17          confusing testimony to create a deliberate misimpression about
          turnarounds.  Further, the prosecutor's turnaround statement
18          during closing was not improper because her argument drew
          inferences from the documentary evidence.  Thus, we conclude
19          that there is no plain error in these instances.

20  #62-1, Ex. 187, at 1-2 (citation footnotes omitted).

21      The state supreme court's rejection of petitioner's claim was neither contrary to nor an

22  unreasonable application of clearly established federal law as determined by the United

23  States Supreme Court.

24      At the outset, petitioner does not identify an apposite holding of the United States

25  Supreme Court that the state supreme court's decision either contradicted or unreasonably

26  applied.  Petitioner refers to the following passage from *Darden v. Wainwright*, 477 U.S. 168,

27

28      [29]#55, Ex. 148, at 66-68.

-16-

1  106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), as a statement of a due process standard allegedly
2  violated by the prosecutor in his case:

4              Under this standard of review, we agree with the reasoning
               of every court to consider these comments that they did not
5              deprive petitioner of a fair trial. *The prosecutors' argument did
               not manipulate or misstate the evidence*, nor did it implicate other
6              specific rights of the accused such as the right to counsel or the
               right to remain silent.

7  477 U.S. at 181-82, 106 S.Ct. at 2471-72 (as emphasized by petitioner herein).  However,
8  "clearly established federal law" for purposes of review under the AEDPA refers to the
9  holdings, as opposed to the *dicta* of the decisions of the United States Supreme Court as of
10 the time of the relevant state-court decision.  *E.g., Carey v. Musladin*, 549 U.S. 70, 74, 127
11 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006).  *Darden* made no holding that an argument that is
12 alleged to have "manipulated" or "misstated" the evidence violates due process.  The *Darden*
13 Court instead was presented with a case in which the prosecutor made improper arguments
14 that did not misstate the evidence.  The Court's statements regarding a situation not before
15 it – prosecutorial argument allegedly manipulating or misstating evidence – reflect *dicta* rather
16 than a holding of the high court.  The constitutional standard instead applied by the Court was
17 "whether the prosecutor's comments 'so infected the trial with unfairness as to make the
18 resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471
19 (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

20         This distinction between holding and *dicta* is a significant one given that, in situations
21 where the defendant maintains that the prosecution knowingly used false testimony, it is
22 established law that conflicts in the testimony and evidence do not demonstrate prosecutorial
23 misconduct.  *See, e.g., United States v. Zuno-Arce (Zuno-Arce I)*, 44 F.3d 1420, 1423 (9th Cir.
24 1995).  Conflicts in the evidence instead must be resolved by the jury.  *Id.*  The *dicta* in
25 *Darden* provides a slender reed upon which to premise a constitutional rule invalidating a
26 conviction on due process grounds where it is maintained that the State either presented
27 "misleading" evidence that was contradicted by other trial evidence and/or misstated
28 evidence.  For example, in this case, both the associate warden to whom all of the

-17-

1  correctional officers at the prison reported and the control officer responsible for the unit in

2  question testified that turnarounds were not conducted at the relevant time.   Perhaps the

3  associate warden was not fully conversant with what his subordinates were actually doing out

4  in the prison, but he did so testify.   Perhaps the control officer was not correct as to her

5  recollection of events and/or in her knowledge as what was going on outside her unit, but she

6  did so testify.   In all events, it is subject to question that clearly established federal law as

7  determined by the Supreme Court holds that a prosecutor commits a due process violation

8  when it is maintained that her evidence and her argument based upon inferences from the

9  evidence are contradicted by other evidence and inferences.   *Inter alia*, the State's evidence

10  is not necessarily unconstitutionally improperly "misleading" merely because it is contradicted

11  by other evidence, even strong evidence, that also is before the jury.[30]

12          In any event, however, the Nevada Supreme Court's rejection of this claim did not

13  reflect an unreasonable application of the due process standard, *i.e.*, whether the

14  prosecutor's comments and actions so infected the trial with unfairness as to make the

15  resulting conviction a denial of due process.[31]   At bottom, the turnaround issue in truth was

16  nothing more than a red herring.   Correctional Officer Cutshaw logged turnarounds at 1:32,

17  2:00, 2:40, 3:02, and 3:30 that afternoon.   Smith thus had sufficient opportunity – even

18  allowing for there being a turnaround procedure followed by the whole prison at the time – to

19  return to Unit 6 in time to participate in the attack on Silva.   At least one turnaround, and

20  potentially two, occurred between the time that Smith left the visiting room and the attack on

21  ─────────────

22  [30]Petitioner's reliance upon federal circuit authority and American Bar Association (ABA) standards is
misplaced, as petitioner must establish that the decision of the state court was contrary to or an unreasonable

23  application of clearly established federal law as determined by the United States Supreme Court.   His
reliance upon federal court decisions regarding prosecutorial misconduct from federal criminal trials is

24  particularly misplaced given that reversals in federal criminal cases based upon prosecutorial misconduct
often are based upon the exercise of supervisory authority over federal criminal trials rather than upon

25  constitutional violations.   *See,e.g., Darden*, 477 U.S. at 181, 106 S.Ct. at 2471.   Moreover, it is well-
established that  ABA standards do not necessarily establish what the Constitution commands in a given

26  context.   *See,e.g., Jones v. Barnes*, 463 U.S. 745, 753 n.6, 103 S.Ct. 3308, 3313 n.6, 77 L.Ed.2d 987 (1983).

27          [31]The Court notes again that the state court decision need not cite the Supreme Court's opinions or
even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts

28  them.   *E.g., Mitchell,* 540 U.S. at 15-16, 124 S.Ct. at 10.

1   Silva occurred.[32]  Smith's alibi defense thus did not turn upon the presence or absence of
2   turnarounds but instead upon the credibility of the defense testimony that he instead
3   remained in the lower yard talking with the other two inmates.  Turnaround procedure did not
4   prevent Smith from returning in time for the attack.  The fact that the State, figuratively, lost
5   the scent and went down a less persuasive path regarding the presence or absence of
6   turnarounds did not so infect the trial with unfairness as to make the resulting conviction a
7   denial of due process.  From the State's perspective, the weak turnaround argument, at best,
8   was of only marginal effect, essentially begged the question, and missed the main and more
9   persuasive point.  At worst, the State's weak turnaround evidence and argument added grist
10  to the mill for the argument that the defense in fact made seeking to challenge the integrity
11  and veracity of the State's presentation.  What the State's turnaround presentation clearly did
12  not do, however, was severely prejudice Smith's alibi defense.  The alibi defense, again, did
13  not in fact turn upon the presence or absence of turnarounds, as Smith could have returned
14  to the unit in time even with a turnaround procedure.

15      The state supreme court's rejection of the claim therefore was neither contrary to nor
16  an unreasonable application of clearly established federal law as determined by the United
17  States Supreme Court.

18      Ground 1 accordingly does not provide a basis for federal habeas relief.[33]

19

20      [32]See note 33, *infra*, regarding the time line for the attack.

21      [33]Petitioner appears to suggest that the State maintained that the attack occurred at exactly 3:00 p.m.
22  as opposed to at or after 3:00 p.m.  Petitioner further suggests that the weight of the evidence indicated that
    the attack instead occurred much earlier.  Petitioner asserts that inmate witness Ricky Ebel testified that the
23  assault instead took place between 11:00 a.m. and 12:00 noon (at which time Smith actually would have
    been in the unit), that inmate Juan LaPeire testified that the attack took place at 1:10 or 1:15 p.m. (at which
24  time Smith would not have been in the unit), and that only one eyewitness to the beating, Richard Watson,
    testified that the beating began at 3:00 p.m.  Petitioner urges, however, that inmate Watson "had a reputation
25  as a liar and a perjurer."  Petitioner urges that the State therefore "desperately" needed to prove that Smith
    was back in his cell (he needed only be in the unit) before 3:00 p.m.  #107, at 6.

26
27      The foregoing includes substantial misrepresentations and material omissions.  For example, inmate
    Ebel, who had memory problems, testified at trial that the attack occurred at approximately 3:00 p.m., but he
28  had originally thought that the attack occurred in the morning and that is what he initially told investigators.

                                                                        (continued...)

-19-

**Ground 2(e):   Prosecutorial Misconduct – Deceased Co-Defendant's Statement**

In Ground 2(e), petitioner alleges that he was denied due process in violation of the Fifth and Fourteenth Amendments when the prosecutor referred in closing argument to

---

[33](...continued)

Ebel testified that the incident lasted 12 to 15 minutes and that afterwards he went to get the bubble officer, a black male.  He testified that the officers had changed shifts with Stacy Miller having gone off duty and "the black male" having come on duty.  He acknowledged that he had previously testified to the grand jury that Richard Irvine had said that "something was going to go down" around 2:30 or 3:00.  #46, Ex. 122, at 48-49; #47, Ex. 125, at 21-22, 26-27, 33-35, 39-40, 49, 62-63, 98, 106 & 113.  Inmate Ebel's testimony lines up with Correctional Officer Bynum's testimony that he relieved Miller at approximately 3:30 p.m. and that two inmates advised him of the man down at approximately 3:37 p.m.  Petitioner's blanket statement that "Ricky Ebel testified that the assault instead took place between 11:00 a.m. and 12:00 noon" thus misrepresents the record.  His full testimony, in context, instead tends to establish that the attack began at or after 3:15 p.m.

Similarly, inmate LaPeire testified that the attack occurred at approximately 3:00 p.m. and that Smith and Rowland had planned the previous evening to attack Silva at 2:30 or 3:00 p.m. (this point in time would be after Smith's upcoming family visit was completed).  #52, Ex. 133, at 81-83.  LaPeire acknowledged that he had said in a prior statement to investigators -- at a point in time, according to his testimony on redirect, when he was not yet being entirely forthcoming -- that the incident occurred at 1:10 or 1:15 p.m.  #52, Ex. 136, at 13-15, 19-20, 37, 75 & 83-84.  Also, similar to Ebel, LaPeire testified that he had memory problems due to drug abuse.  #52, Ex. 136, at 11-12, 17, 19, 36 & 66-67.  Petitioner's blanket statement that "Juan LaPeire testified that the assault took place at 1:10 or 1:15 p.m." thus misrepresents the record.

Petitioner's statement that Watson was the only eyewitness to the beating who testified that the attack occurred at or after 3:00 p.m. thus is incorrect, as Ebel and LaPeire both so testified.

Moreover, the statement materially glosses over additional testimony placing Smith in the unit and/or Silva's cell at the relevant time.  Inmate Timothy Wade testified that he was on the phone with his wife in Unit 6 during one of two 2:40 and 2:55 p.m. calls when Tony Smith walked by with Rowland and told Wade to mind his own business.  The portion of the prison's tape of the call (inmate calls were recorded) with Smith's interruption was played for the jury.  See #53, Ex. 139, at 95-106; id., Ex. 141, at 36-38.  Inmate James Reid testified that he observed both Rowland and Smith coming out of Silva's cell with items in their hands while Reid was making a call at approximately 3:27 p.m., "pretty close to the shift change."  #51, Ex. 131, at 41-51 & 69-70; see also #51, Ex. 132, at 23-29 (prior inconsistent statements as to time).  Reid's testimony ties in with the testimony of both inmate Ebel and Correctional Officer Bynum as to the time line.  Inmate David Springfield testified that he saw Smith and Rowland coming out of Silva's cell in the afternoon approximately fifteen minutes before the lockdown. #53, Ex. 141, at 98-109; #54, Ex. 142, at 5-8, 15-17 & 23-24.

The State's time line thus did not hinge solely upon inmate Watson's testimony.  The Court further notes that the primary witnesses for both the State and Smith were inmates, and none were model citizens.  Nor do the trial transcript pages cited by petitioner in truth establish that Watson "had a reputation as a liar and a perjurer."  See #107, at 6, line 9 (a statement by defense counsel that Watson committed perjury at the trial is not evidence, and the investigator testified only that an allegation by Watson could not be pursued because he was too ill for the polygraph required by policy).  Moreover, over and above a general tendency of inmates to not come forward for fear of being targeted as a "snitch," there is pervasive evidence in the state record of witness intimidation, including threats against and/or attacks on witnesses.  See note 94, infra.

Ironically, petitioner's claim of a misleading State presentation thus itself includes misrepresentation and material omission.  Such misrepresentation and omission detracts from rather than supports the claim.

allegedly inadmissible statements by Richard Irvine, the deceased co-defendant.  Petitioner
contends that the prosecution thereby improperly informed the jury for the first time that Irvine
had pled guilty and agreed to a life sentence and that Irvine had testified against Smith at the
grand jury, all at a point in the trial when Smith had no opportunity to rebut this information.
Petitioner further contends that the prosecutor improperly vouched for Irvine's credibility.

Petitioner contends, in particular, that he was denied due process in the following
excerpts from the closing argument, which occur twenty pages apart in the transcript:

> . . . . Irvine testified to the grand jury in June. . . . . He
> testified truthfully, he testified completely, plead guilty to first
> degree murder, life without. . . . . Irvine took it, he testified.
>
> . . . . .
>
> . . . . Irvine was in there stealing the stuff.  No doubt about
> it.  Everybody saw it. . . . .
>
> . . . . .
>
> And the guy eventually kills himself.  He takes the deal
> which is in the letter that you saw that was presented to the grand
> jury, he testifies at the grand jury.  He testifies about what these
> guys did and did not do, and then he commits suicide. . . . .

#55-2, Ex. 147, at 146-47 & 167.

At bottom, the petitioner's claim is based upon selective presentation of what actually
occurred at trial.  The claim is based upon selective presentation, first, as to how the jury in
fact was first informed that Irvine had pled guilty and agreed to a life sentence as part of a
plea deal in which he agreed to cooperate with the State and testify at the grand jury.  The
claim further is based upon selective presentation, second, as to what the prosecutor actually
said in closing argument.  The material excised by petitioner from the above excerpts places
the statements in the closing argument in a considerably different light.

In its case-in-chief, the State called Richard Varner, a lieutenant with the Nevada
Division of Investigations (NDI).  Varner testified on direct, without objection, that Richard
Irvine testified before the grand jury on June 18, 1998, as part of a cooperation agreement
with the State.  Varner further testified on direct that on July 11, 1998, Irvine was found dead
by hanging in his cell, in what investigators concluded was a suicide. #51, Ex. 130, at 49-53.

1    On cross-examination, defense counsel for co-defendant Rowland sought to elicit

2  testimony from Varner that under the cooperation agreement, Irvine was going to plead guilty

3  to Silva's murder and that he thereby would avoid the death penalty.  Varner was not sure as

4  to the former but recalled the latter to be the case.[34]

5    On redirect, "[b]ased on what counsel just raised," the prosecutor inquired as to the

6  terms of the cooperation agreement.  The June 9, 1998, letter memorializing the agreement

7  provided, *inter alia*, that Irvine would plead guilty to first degree murder, that the State would

8  seek life without the possibility of parole rather than the death penalty, that Irvine would

9  cooperate and testify truthfully whenever called by the State, and that the State could

10 prosecute Irvine on any and all charges and seek the death penalty if he refused to testify

11 when called or if he testified falsely.  The prosecutor then offered the letter memorializing the

12 cooperation agreement into evidence.  Smith's counsel had no objection.  Rowland's counsel

13 objected only to the entire document coming into evidence given that the relevant portions

14 had been read into evidence.  The entire letter was admitted into evidence.[35]

15   The State also called NDI criminal investigator John Peterson in its case-in-chief.

16 Peterson testified, *inter alia*, that he had taken statements from Richard Irvine, that Irvine

17 reached an agreement to cooperate with the State and testify, that Irvine did testify at the

18 grand jury, and that Irvine hung himself about three weeks later.  Peterson did not testify as

19 to the content of either the statements taken from Irvine or his grand jury testimony.[36]

20   During her closing argument, the prosecutor discussed trial testimony tending to

21 establish that Smith and Rowland were actively seeking to lay all of the blame upon Richard

22 Irvine alone.  Ricky Egberto had testified that, at a point in time prior to Irvine's suicide, Smith

23 and Rowland admitted to him while they were waiting in the prison infirmary that they had

24 beaten Silva.  They indicated, however, that Richard Irvine was going to take full responsibility

25

26    [34]#51, Ex. 130, at 54-55.

27    [35]#51, Ex. 130, at 55-57; #70-10, Ex. 274 (trial exhibit 171).

28    [36]#52-5, Ex. 137, at 72-73, 80-82 & 84.

1  alone.  Allen Clingempeel had testified that after Irvine committed suicide, Smith, with

2  Rowland present, sought to have Clingempeel testify that Irvine confessed to him that he

3  committed the murder acting alone.[37]

4       The first statement excerpted by petitioner from the State's closing argument comes

5  from this discussion of how Smith and Rowland had to change tactics after Irvine started

6  cooperating with the State and then committed suicide:

7

8       Clingempeel is approached by Tony [Smith], hey, man, you
     got to do something, you can save me and Rob's life.  He knows
     that Allen Clingempeel was in the same unit, C wing in [Unit] 12

9       with Irvine for a while and some Mexican Allen says.  Okay, tell
     them why you were in there with him.  Irvine said that he did the

10       murder all by himself.  Get us off the hook here.

11       Remember when Egberto said March 2d in the infirmary,
     these guys thought Irvine was going to ride it.  He was going to

12       take the blame.  He was already in on eight life sentences for a
     rape years ago with a weapon.  Eight lifes, where was he going?

13       So he was going to ride it.  That was March 2d.  And he didn't ride
     it.

14
     Remember Peterson's statements, NDI Officer Peterson,

15       the former FBI guy, March 26th, Irvine came over, gave a
     statement, he wasn't riding it anymore.  Irvine testified to the

16       grand jury in June, the letter is in there, *the letter is in evidence
     what Irvine's deal was.*  He testified truthfully, he testified

17       completely, plead guilty to first degree murder, life without. *That's
     your deal.*  He's already in on eight lifes, that would have given

18       him nine lifes, but he wouldn't be facing the death penalty.  Irvine
     took it, he testified.

19
     So now, Tony does have to worry about here now, we got

20       to find a way to lay this thing off on Irvine.  Allen is going to help
     us do that.  He lived in the same section with him in C, he talked

21       to him all the time and Allen says, yeah, okay, I'll do it.  Tony
     offers him the protection of the car [i.e., the GFBD gang].

22       Remember that?

23  #55-3, Ex. 147, at 146-47 (emphasis added).

24       The second statement excerpted by petitioner from the State's closing argument

25  comes from an extended discussion by the prosecutor regarding the testimony of inmate

26  Jason Jones, who was called in Smith's case-in-chief.  Jones testified on direct that four men

27

28      [37]See #53-2, Ex. 139, at 30-41 & 43-45 (Egberto); #111, Ex. 142-S, at 25-48 (Clingempeel).

1   were involved in the attack, and he identified them as David Baker, Rick Ebel, Rob Rowland,

2   and Juan LaPeire, with Smith not being present.  According to Jones, Ebel stayed outside the

3   cell as a lookout while Baker, Rowland, and LaPeire went inside.  According to Jones, it was

4   Baker who attacked Silva.[38]

5        In closing argument, the prosecutor suggested that Jones was not a reliable witness

6   because he had changed his story multiple times and he was seeking to testify in return for

7   personal gain.[39]  She maintained that Jones' testimony at trial that Baker rather than Irvine

8   was in Silva's cell was contradicted by the testimony of multiple other witnesses.  She

9   suggested that while Baker was "probably in this thing up to his eyeballs in some respects,"

10  Baker clearly "was not one of the three guys in there, in there beating and killing and stealing

11  from Steve Silva."[40]

12       The prosecutor then maintained that – in contrast to Jones' testimony that Baker was

13  in Silva's cell with the others – the evidence reflected that it instead was Irvine in Silva's cell

14  with Rowland and Smith:

15            It was Irvine.  Irvine was in there stealing the stuff.  No
          doubt about it.  Everybody saw it.  The guys [sic] a nutcase, he's
16        a whacko and Irvine was a blundering idiot afterwards.  He was
          crying when the cops came in, is he going to live, is he okay.
17        Nervous with Stanley and Council and those guy merits, he's
          crying, a couple of hours later he is on the floor sucking his
18        thumb, he's so upset about this.

19            And I submit to you that's because he thought there was
          going to be a beating and a punishment and maybe a robbery.
20        He sure didn't expect the guy to die.  He totally fell apart over it,
          and he totally fell apart out of guilt, out of fear, because now he
21        know's he's wrapped up with the GFBD in a murder out of, you
          know, what do I do now because he's supposed to take the rap
22        for this thing since he's got all the lives.

23            And the guy eventually kills himself.  He takes the deal
          which is in the letter that you saw that was presented to the grand
24        jury, he testifies to the grand jury.  He testifies about what these

25  _____

26  [38]#54-2, Ex. 143, at 5-11.

27  [39]#55-3, Ex. 147, at 165-66.  See also #54-2, Ex. 143, at 11-76 (corresponding cross-examination).

28  [40]#55-3, Ex. 147, at 166-67.

1
2

> guys did and didn't do, and then he commits suicide.  They're calling him a rat, they're all telling people stuff about him.

3
4

> According to Clingempeel, they're saying he raped a black guy and a white girl.  You know Irvine was one of the guys in there, but we know from what everybody saw, Irvine wasn't one of the beating guys.  Rob was.  Irvine wasn't one of the kicking guys, Tony was.

5
6

> We know that Jason Jones is full of bologna about that.
> . . . .

7   #55-3, Ex. 147, at 166-67.

8   All of the foregoing argument was made without objection.

9   On direct appeal, the Supreme Court of Nevada rejected the claims of prosecutorial

10  misconduct in argument that were presented to that court, but without specifically referring

11  to the prosecutor's reference in closing argument to allegedly inadmissible statements by

12  Richard Irvine.  The state supreme court rejected the basket of prosecutorial misconduct

13  claims on the following grounds:

14
15
16
17

> . . . . This court may consider sua sponte plain error which affects the defendant's substantial rights, if the error either: "(1) had a prejudicial impact on the verdict when viewed in context of the trial as a whole; or (2) seriously affects the integrity or public reputation of the judicial proceedings." . . . .

18
19
20
21
22

> . . . Smith asserts that several of the prosecutor's arguments were so improper and prejudicial that they constitute reversible plain error, including witness vouching, personal opinion, pressuring the jury to convict, and dilution of the reasonable doubt standard.  We disagree.  While giving her personal opinion in argument and vouching for a witness's credibility were improper, we conclude that the prosecutor's actions did not have a prejudicial impact on the verdict because there were a number of witnesses directly connecting Smith to the crime.

23  #62, Ex. 187, at 1 & 2 (citation footnotes omitted).

24  The state supreme court's rejection of the claim was neither contrary to nor an

25  unreasonable application of clearly established federal law as determined by the United

26  States Supreme Court.

27  As noted at the outset of the discussion of this ground, Ground 2(e) is bottomed upon

28  a selective presentation of both the evidence and the prosecutor's closing argument.

1   Petitioner urges that the prosecutor improperly informed the jury for the first time in

2   closing argument that Irvine had pled guilty and agreed to a life sentence and that Irvine had

3   testified against Smith at the grand jury, all at a point in the trial when Smith had no

4   opportunity to rebut this information.  This allegation is directly belied by the trial record, which

5   conclusively demonstrates that the prosecutor was referring to testimony and documentary

6   evidence that had been introduced at trial – without any objection as to the substance of the

7   evidence.  The prosecutor further did not provide any new information when she stated that

8   Irvine testified "about what these guys did and didn't do."  The jury already had been informed

9   during the presentation of the trial evidence, without objection as to substance, that Irvine had

10  agreed to cooperate with and testify for the State.  The prosecutor's statement that Irvine

11  testified "about what these guys did and didn't do" did not reveal specifics of Irvine's grand

12  jury testimony, as the reference was too vague to have any specific meaning.  Again, the trial

13  evidence, without objection as to substance, already reflected that Irvine had testified

14  pursuant to an agreement to cooperate with the State.  Any allegation that the prosecutor

15  introduced this information for the first time in her closing argument is indisputably refuted by

16  the trial record.

17  Petitioner further urges that the prosecutor vouched for Irvine's credibility, relying upon

18  her statements: ". . . He testified truthfully, he testified completely, plead guilty to first degree

19  murder, life without. . . ."  However, to make this excerpt appear to be vouching, the

20  sentences bracketing this excerpt had to be excised:

21
22              . . . Irvine testified to the grand jury in June, the letter is
            in there, *the letter is in evidence what Irvine's deal was*.  He
23          testified truthfully, he testified completely, plead guilty to first
            degree murder, life without.  *That's your deal. . . .*

24  #55-2, Ex. 147, at 146-47 (emphasis added).  The prosecutor clearly was describing the basic

25  terms of the cooperation agreement with the State, not vouching for Irvine's credibility.

26  Petitioner's misleading selective presentation of the closing argument and associated

27  state court record is not persuasive.  Nothing in the prosecutor's closing argument that is

28  challenged in Ground 2(e) deprived Smith of a fundamentally fair trial or due process.

1    Ground 2(e) therefore does not provide a basis for federal habeas relief, whether on

2    deferential AEDPA review or on *de novo* review.

3    ### Ground 3:   Loss, Destruction and/or Failure to Test Evidence

4    In Ground 3, petitioner alleges that he was denied due process in violation of the Fifth

5    and Fourteenth Amendments when the State allowed a fan to be lost or destroyed, failed to

6    test blood evidence, and allowed a piece of note paper to be lost or destroyed.

7    ### The Fan

8    According to the testimony of the involved officers, on January 26, 1998, a week after

9    the murder, Smith was "rolled up" by correctional officers and placed into the administrative

10   segregation lockdown unit as a suspect in the murder.  The property from Smith's cell was

11   taken down to the property room, and the officers inventoried the property.  The officers found

12   a number of items, including a fan, that did not appear to be part of Smith's authorized

13   property.  They set the items aside for the property room sergeant to review.  None of the

14   items had Silva's name or identification number, and nothing about the property suggested

15   to the officers at that time that it was connected to the Silva case.  An inmate having

16   unauthorized property was a rule violation but nonetheless was a common occurrence.[41]

17   The testimony of the property room sergeant, Gerald Adamson, and associated

18   documentary evidence reflected the following.

19   On January 28, 1998, Sergeant Adamson wrote a notice of charges against Smith for

20   having multiple items of unauthorized property, including, as written on the notice, "one

21   Holmes fan."[42]  Smith did not have a fan on his inmate personal property card as of January

22   19, 1998.[43]  Silva did have a fan described as a "Holmes 10" HABF" with a number "281"

23   designated on his property card at that time. Sergeant Adamson testified that this "HABF"

24

25   [41]#50, Ex. 128, at 107-09 (Correctional Officer Rod Moore); #51, Ex. 130, at 28-41 (Correctional
     Officer Joseph Krodel); *id.*, at 68-71 (Correctional Officer Larry Adamson).  See also #48, Ex. 126, at 23-27.
26

27   [42]#47, Ex. 125, at 137-41; #48, Ex. 126, at 31; #67, Ex. 235 (trial exhibit 92).

28   [43]#47, Ex. 125, at 136-37; #48, Ex. 126, at 19; #67, Ex. 239 (trial exhibit 94D).  The Holmes box fan
     shown on Smith's property card was purchased on July 7, 1998, after the Silva murder.

-27-

1  designation on Silva's property card referred to a Holmes box fan.[44]  However, Sergeant

2  Adamson was unable to identify the specific Holmes fan that was the subject of the notice of

3  charges against Smith as the property of any other specific inmate, including Silva.[45]

4        There were two types of fans sold and in use at the prison at the time, a Holmes ten-

5  inch box fan and a six-inch oscillating fan.  Sergeant Adamson acknowledged that Holmes

6  also manufactured an oscillating fan.  He testified, however, that his reference to a Holmes

7  fan at the time in question referred to a Holmes box fan, as he referred to the box fan as a

8  Holmes fan.  About ninety-five percent of the fans coming through the property room were

9  Holmes box fans.[46]  Adamson, again, made no connection between the Holmes fan for which

10  Smith was written up and the specific Holmes box fan on Silva's property card at the time.

11        Two days later, on January 30, 1998, Smith pled guilty to the notice of charge,

12  maintaining that he had bought the items on the yard from other inmates.  He received a

13  minor disciplinary sanction of ten days loss of canteen privileges.[47]

14        The fan and the remaining unauthorized property was donated to charity approximately

15  four to six weeks later, in early 1998, as part of a regular donation of such property.  The

16  prosecutor inquired as to the disposition of the property about three months prior to the April

17  1999 trial, but the property long since had been donated to charity.[48]

18        During his direct testimony, Correctional Officer Larry Adamson, one of the officers

19  who had rolled up Smith initially, testified initially that Sergeant Gerald Adamson found that

20  some of the unauthorized property items belonged to Silva.  At the end of the direct, however,

21  following a bench conference, the prosecutor had Correctional Officer Adamson correct his

22  testimony to state that he never did see any of the property actually identified as Silva's, that

23

24        [44]#47, Ex. 125, at 135-36 & 142-43; #48, Ex. 126, at 19; #67, Ex. 238 (trial exhibit 94C).

25        [45]#47, Ex. 125, at 141; #48, Ex. 126, at 9-10.

26        [46]#47, Ex. 125, at 153-56; #48, Ex. 126, at 18-19, 27-28 & 30-31.

27        [47]#51, Ex. 130, at 4-14; #67, Ex. 235 (trial exhibit 92).

28        [48]#47, Ex. 125, at 141-42; #48, Ex. 126, at 9-11.

he had no such knowledge of his own personal knowledge, and that he had been speculating when he testified earlier on direct that property had been identified as Silva's.[49]

Correctional Officer Larry Adamson further testified that it would not have been unusual for the administrative disciplinary charge to be pursued against Smith without prison staff notifying the investigative team of the administrative charge.  He did not learn that the property had been donated to charity until several months later.[50]

Smith testified in his case-in-chief that the fan found in his possession had been a Holmes oscillating fan that he bought on the yard from another inmate.[51]

In closing argument, the prosecutor did not discuss the fan other than in connection with a jury instruction regarding lost evidence.  In arguing the issue of whether the lost fan was material to the defense, the prosecutor sought to argue that the fan instead would have had inculpatory value.  She maintained that "it would have said this is on Silva's list and it's not on Tony's list, ergo it's part of the stolen property."[52]

***Blood Evidence***

During the initial investigation, officers observed blood on a towel and a roll of toilet paper in Silva's cell.  The attack otherwise did not generate large quantities of blood either on the victim's body or the surrounding area.[53]  Petitioner has not pointed to any evidence indicating that any of the assailants were reported to have been bleeding at the scene.  As noted in the foregoing discussion of the fan, Smith was not "rolled up" and placed in administrative segregation as a suspect until one week after the attack, and it does not appear that any of his clothing was set aside for testing when his property was inventoried.

---

[49]#51, Ex. 130, at 72 & 83-85.

[50]#51, Ex. 130, at 71-73.

[51]#54, Ex. 144, at 79-85; #55-2, Ex. 146, at 80-81.

[52]#55-3, Ex. 147, at 170-74.

[53]#50, Ex. 129, at 100-01; see,e.g., #45, Ex. 120, at 102; #47, Ex. 125, at 29 & 95; #50, Ex. 128, at 26-28 & 59-60; *id.*, Ex. 129, at 100.

1    Criminalist Maria Fassett testified as follows.  She did not test the towel and toilet

2 paper roll recovered from Silva's cell because she would not test items that most likely had

3 the victim's blood on them absent information indicating that more than one person was

4 bleeding at the scene.  The presumptive presence of blood was found on some additional

5 items, but DNA testing could not be completed prior to trial due to technical problems at the

6 DNA laboratory.  The defense made no request to conduct blood or DNA testing at any time.[54]

7    There is no indication that any of the foregoing materials were lost or destroyed, as

8 opposed to not being subjected to further testing in advance of trial.

9    ***The Note Paper***

10    A note was found in Silva's cell that had "Expect No Mercy" written on it in block print

11 along with a PNR logo, which corresponded to a gang abbreviation for "Proud Nazi Race," a

12 white pride slogan.  This note was preserved and introduced into evidence at trial.  According

13 to the testimony of the State's forensic handwriting expert, block printing commonly was used

14 to disguise the writer's handwriting.  The block printing on the note also had a tremor in it,

15 which also possibly may have reflected an effort to disguise the writer's handwriting, among

16 other potential causes.  The examiner was unable to identify the block print as a specific

17 individual's writing based upon the non-block writing samples that he was provided.  His

18 findings thus were inconclusive, without including or excluding any individual.[55]

19    / / / /

20

21    [54]#53, Ex. 139, at 9-10, 26-27 & 29.  These are the record pages cited by petitioner in the amended

22 petition with regard to the additional items.  Petitioner refers to the additional items in the text in the amended
petition, but he does not refer to them again later in the reply.  In the amended petition, petitioner refers to the

23 items only as "clothing items collected from other inmates." #23, at 30, line 6.  Given the voluminous trial
transcript and petitioner's burden of proof on federal habeas review, it is incumbent upon petitioner to identify,

24 with specific record citation, specifically what the items were and how the items were material to the case.
While the Court has conducted extensive independent review of the state court record herein, it is not the

25 Court's responsibility on federal habeas review to go trolling through an extensive state trial record to attempt
to identify and determine the context and significance of unexplained items of evidence, particularly when the

26 items are not even mentioned, even generically, again in the reply.

27    [55]#50, Ex. 129, at 61-64 (Criminal Investigator Wideman); #52, Ex. 137, at 33-34, 47-51 & 56-59
(Forensic Document Examiner Whiting); #53, Ex. 138, at 18-24 & 47 (Criminal Investigator Swann); #113, Ex.

28 210-S (trial exhibit 3).

1    The day after the murder, officers searched the unit for, *inter alia*, paper similar to the

2    "Expect No Mercy" note.  In James Reid's cell in C wing, they found a letter written in pencil

3    on the same type of note paper.  Reid, an African-American, later was one of the State's

4    witnesses.  Correctional Officer Moore initially logged the letter into the prison's evidence

5    room.  Moore testified that the letter was of a similar physical size to the note paper that they

6    had been looking for, but it only had unrelated pencil writing on it in letter form.  He observed

7    nothing that would cause him to have it booked into evidence in the murder case.  Although

8    the letter was the only similar piece of paper recovered in the particular search, inmates often

9    would use the same type and size of paper.  Moore subsequently turned the item over to the

10   investigations officer, Correctional Officer Adamson.  He placed the letter in the disciplinary

11   box, which was a general box or file for items that had been determined to have no

12   significance.  The letter later was discarded.[56]

13              ***State Supreme Court Decision and Analysis of Claims***

14   The Supreme Court of Nevada rejected the claims presented to that court on the

15   following grounds:

16              Smith also contends that the district court erred in denying
             his motion to dismiss based on the State's failure to preserve
17           certain evidence, including, the Holmes fan, the blood-stained
             items found in Steven Bruce Silva's cell, and the piece of paper
18           that matched the threatening note.  In establishing a violation of
             due process resulting from the State's failure to preserve
19           evidence, the defendant must demonstrate either: (1) the State
             acted in bad faith; or (2) the defendant was prejudiced and the
20           evidence possessed an exculpatory value that was apparent.  We
             conclude that the State did not act in bad faith because at the
21           time the fan and the piece of paper were retrieved they had no
             evidentiary value.  Further, the State did not act in bad faith
22           regarding the blood-stained items because there was no evidence
             that anyone's blood other than Silva's was present in the cell.  We
23           also conclude that Smith has failed to demonstrate that the
             Holmes fan, the blood-stained items, or the piece of paper have
24           apparent exculpatory value.

25   #62, Ex. 187, at 2-3 (citation footnotes omitted).

26

27

     _____

28       [56]#55, Ex. 147, at 55-61 (Correctional Officer Stamps); #53, Ex. 138, at 18-24 & 55 (Criminal
     Investigator Swann); #111, Ex. 142-S, at 89-98 (Correctional Officer Moore).

1    The state supreme court's rejection of the claims was neither contrary to nor an

2    unreasonable application of clearly established federal law as determined by the United

3    States Supreme Court.

4    In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the

5    Supreme Court addressed a due process claim based upon "the failure of the State to

6    preserve evidentiary material of which no more can be said than that it could have been

7    subjected to tests, the results of which might have exonerated the defendant."  488 U.S. at

8    57, 109 S.Ct. at 337.  The Court held that "unless a criminal defendant can show bad faith on

9    the part of the police, failure to preserve potentially useful evidence does not constitute a

10   denial of due process of law."  488 U.S. at 58, 109 S.Ct. at 337.  The Supreme Court stated

11   its "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause

12   . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve

13   all material that might be of conceivable evidentiary significance in a particular prosecution."

14   *Id.*  When the failure to preserve potentially relevant evidence "can at worst be described as

15   negligent" and "there [is] no suggestion of bad faith on the part of the police," then "there [is]

16   no violation of the Due Process Clause."  488 U.S. at 58, 109 S.Ct. at 337-38.

17   The Supreme Court further expanded upon these principles as follows:

18       . . . .  First, *[California v.] Trombetta*, [467 U.S. 479, 104 S.Ct.

19   2528, 81 L.Ed.2d 413 (1984)] speaks of evidence whose
     exculpatory value is "apparent."  467 U.S., at 489, 104 S.Ct., at

20   2534.   The possibility that the semen samples could have
     exculpated respondent if preserved or tested is not enough to

21   satisfy the standard of constitutional materiality in *Trombetta*.
     Second, we made clear in *Trombetta* that the exculpatory value

22   of the evidence must be apparent "*before* the evidence was
     destroyed."  *Ibid*. (emphasis added).   Here, respondent has not

23   shown that the police knew the semen samples would have
     exculpated him when they failed to perform certain tests or to

24   refrigerate the boy's clothing; this evidence was simply an avenue
     of investigation that might have led in any number of directions.

25   The presence or absence of bad faith by the police for purposes
     of the Due Process Clause must necessarily turn on the police's

26   knowledge of the exculpatory value of the evidence at the time it
     was lost or destroyed. . . . .

27   488 U.S. at 56 n.1, 109 S.Ct. at 336 n.1.

28   / / / /

1   With regard to the fan, petitioner urges that presenting the fan at trial "would have

2 completely destroyed one of the prosecution's critical links between Mr. Silva's attack and Mr.

3 Smith."[57]  This argument is not supported by the trial record.  Petitioner points to Correctional

4 Officer Larry Adamson's initial testimony on direct that the property room sergeant found that

5 some of the unauthorized property belonged to Silva.  While petitioner acknowledges that

6 Adamson later admitted that his testimony was based on speculation, the State in fact fully

7 corrected his testimony to establish that he had never seen any of the unauthorized property

8 actually be identified as Silva's and that he had no such personal knowledge.  The property

9 room sergeant – the only individual who did have personal knowledge of what his own

10 investigation revealed – clearly testified that he was unable to identify the specific Holmes fan

11 that was the subject of the notice of charges against Smith as the property of any other

12 specific inmate, including Silva.  With ninety-five percent of the fans going through the

13 property room being Holmes box fans, and further with possession of unauthorized property

14 being fairly common in the prison, evidence tending to establish that Smith had a fan that he

15 was not authorized to have, even allegedly a Holmes box fan, hardly constituted a "critical

16 link" in the State's case.  Nor was it presented as a critical link by the State.[58]

17   In all events, petitioner did not establish the fundamental requirement for a *Youngblood*

18 claim that officers knew of the alleged exculpatory value of the evidence at the time that it was

19 lost or destroyed.  At the time that the fan was donated to charity, Sergeant Adamson had not

20 identified the fan as Silva's (nor did he do so at any point), and Smith maintained in the

21

22 [57]#107, at 14, lines 13-14.

23 [58]The Court notes again that the State argued the possible probative value of the fan in closing argument only with regard to a jury charge requested by the defense concerning lost evidence.  At best, all

24 that the State could argue is that Smith allegedly had a fan of the same type, which was an exceedingly weak tangential link rather than a critical link in its case.  Petitioner also points to an initial statement by the officer

25 who conducted the disciplinary hearing that the notice of charges "was written over the Silva murder."  The prosecutor immediately asked, however:  "It was written over some property, was it not?"  The officer checked

26 the paperwork and corrected herself:  "Okay, yeah.  It was – it was over the property room property."   #51, Ex. 130, at 7-8.  The officer who in fact wrote the notice of charges, Sergeant Adamson, clearly did not write

27 the charges over the Silva murder.  Petitioner thus attempts, twice, to bootstrap misstatements by a witness that were promptly corrected by the prosecution into indications of how allegedly critical the fan evidence was

28 to the State.  The corrected misstatements did not make the molehill that was the fan evidence any loftier.

disciplinary proceeding that he had obtained the fan from another inmate on the yard.  It would have taken an exceedingly uncommon prescience for officers to foresee that Smith later would maintain at trial that "the Holmes fan" referred to in the notice of charges was an oscillating fan rather than a box fan in an effort to undercut evidence of an allegedly critical fact that the State never in fact established – that the particular Holmes fan that Smith had was Silva's fan.  Petitioner thus never demonstrated the requisite bad faith for a *Youngblood* claim.[59]

The Nevada Supreme Court's rejection of the claim vis-à-vis the fan therefore was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[60]

    */ / / /*

---

[59]Petitioner's asserts that "[t]he State's handling of the evidence, at a minimum, constituted gross negligence tantamount to bad faith." #107, at 19, lines 27-28.  Petitioner cites no apposite authority from the United States Supreme Court making alleged gross negligence "tantamount to bad faith" under *Youngblood* and *Trombetta*.  The circumstances presented in any event do not reflect gross negligence, as any significance of the fan – for either side of the case – was hardly apparent at the time that it was donated to charity.  Moreover, as previously noted, the fan in truth had very little significance even in the final analysis, as establishing that Smith allegedly also had possession of one of the fairly ubiquitous Holmes box fans hardly would have been a smoking gun.  As the state district court observed, "[i]t's not like this fan is . . . the rosetta stone of the case." #111, Ex. 142-S, at 86.

[60]Petitioner contends that he was denied due process under an allegedly less demanding standard for destruction of evidence under Nevada case law.  Petitioner must show that the state supreme court's decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court rather than by the decisions of other courts.  To the extent that petitioner relies upon Nevada state law, such state law claims are not cognizable on federal habeas review, and the state supreme court, which rejected petitioner's claim, is the final arbiter of Nevada state law as applied to his case.  Any suggestion that the state supreme court's application of Nevada state law in this case itself gave rise to a federal due process violation is not persuasive.  Petitioner cites no apposite federal law supporting such a suggestion in the context presented.

    Petitioner further seeks to pursue a *Brady-Agurs* claim in the reply that was not alleged in the amended petition.  Given the particularity required in federal habeas pleading, the assertion of a claim concerning loss or destruction of evidence in an amended petition does not present a *Brady-Agurs* claim, which is a distinct claim.  Petitioner, who is represented by counsel, may not simply start arguing new claims in the reply that were not asserted in the amended petition.  He instead would have been required to seek leave to amend the petition to do so, which at this juncture would require a showing that the amendment would not be futile given exhaustion, procedural default, and timeliness concerns.  This Court repeatedly has admonished the Federal Public Defender that new claims may not be raised for the first time in the reply without a prior grant of leave to amend the petition.  Any such *Brady-Agurs* claim in any event is without merit.

1      With regard to further testing of blood and potential blood evidence, the critical point

2  at the very outset is that this evidence was not lost or destroyed prior to trial.  While petitioner

3  lumps in the blood evidence claim with the fan and note paper claims, a claim based upon

4  a failure to test evidence that was preserved is not the same as a claim based upon the loss

5  or destruction of evidence.  Petitioner identifies no apposite holding of the United States

6  Supreme Court establishing that a State violates due process by not testing preserved

7  evidence.  The *Youngblood* decision instead clearly establishes – directly to the contrary –

8  that "the police do not have a constitutional duty to perform any particular tests."  488 U.S. at

9  59, 109 S.Ct. at 338.  Indeed, the Supreme Court stated that it "strongly disagree[d]" with the

10 "statement that the Due Process Clause is violated when the police fail to use a particular

11 investigatory tool."  488 U.S. at 58-59, 109 S.Ct. at 338.  This claim therefore does not even

12 make it out of the starting gate.  If petitioner wanted further testing conducted on any

13 evidence, it was up to the defense to figuratively roll the dice and seek such testing, running

14 the risk that the outcome may have proved inculpatory rather than exculpatory.[61]  He may not

15 decline to do so and then maintain after an adverse result at trial that the State failed to

16 conduct testing of preserved evidence that allegedly would have been exculpatory (which in

17 truth has not been established, as, to this day, it remains speculative as to whether further

18 testing would have been exculpatory, inculpatory, or lacking in any significant results).

19     The Nevada Supreme Court's rejection of the claim vis-à-vis the blood evidence

20 therefore was neither contrary to nor an unreasonable application of clearly established

21 federal law as determined by the United States Supreme Court.[62]

22

23 _____

24     [61]*Cf. District Attorney's Office for Third Judicial District v. Osborne*, ___ U.S. ___, 2009 WL 1685601, at slip page *20 (June 18, 2009)(Alito, J., concurring)(discussing potential gaming of the system by the defense in declining to seek testing, quoting the concurring state appeals court judge's statement that "'a

25 defendant should not be allowed to take a gambler's risk and complain only if the cards [fall] the wrong way.'").

26     [62]As with the fan claim, petitioner seeks to pursue a *Brady-Agurs* claim in the reply with regard to the

27 blood evidence that was not alleged in the amended petition.  The Court's comments in footnote 60 regarding the fan claim apply fully to this claim as well.  Any such *Brady-Agurs* claim further clearly is without merit.

28                                                                                                    (continued...)

-35-

1    With regard to the note paper, petitioner has not established that inmate Reid's letter

2   written on similar paper had any additional exculpatory value at all, much less an exculpatory

3   value that was apparent to officers when it was discarded.  The only exculpatory value that

4   petitioner identifies is that the letter was the only piece of paper found during the search that

5   matched the type of paper used for the "Expect No Mercy" note.  This fact, however, was

6   abundantly established by the trial testimony and was not contested by the State.  Petitioner

7   failed to show what having the otherwise inconsequential piece of paper itself in evidence

8   would have established that otherwise was not already clearly established at trial.  Petitioner's

9   contention that he was denied due process and that his conviction should be overturned

10  because this otherwise unrelated piece of paper was discarded strains credulity.

11   The Nevada Supreme Court's rejection of the claim vis-à-vis the note paper therefore

12  was neither contrary to nor an unreasonable application of clearly established federal law as

13  determined by the United States Supreme Court.[63]

14

15  _____

16   [62](...continued)
     Petitioner further contends that the State improperly commented on his post-arrest silence and/or
17  improperly left the jury with the impression that the defense could have requested testing.  Petitioner points to
    the State criminalist's testimony that the defense had made no request to conduct blood or DNA testing at
18  any time.  See text, *supra*, at 30.  Petitioner further points to a question asked of him on cross-examination,
    without objection, as to whether he asked the correctional officers to preserve his clothing as evidence when
19  he was rolled up. #55, Ex. 146, at 83-84.  The cross-examination inquiry came after a direct examination
    during which Smith testified that he "was hoping they would be" collected for evidence. #54, Ex. 144, at 95.
20  The defense further was affirmatively taking the State to task for failures to preserve and/or test evidence,
    including the failure to further test the blood evidence, and had obtained a jury instruction in this regard.

21
     Petitioner has not come forward with any apposite authority establishing that the above constituted an
22  unconstitutional comment upon post-arrest silence or otherwise was improper.  The defense affirmatively had
    put the matter of failure to preserve and/or test evidence at issue, and there was nothing improper with the
23  State pointing out that the defense had not requested testing of the evidence.  Such a suggestion was fully
    consistent with the governing law – under which the State was not constitutionally required to conduct further
24  testing and the defense could request testing if it so desired.  Smith further opened the door on direct to the
    question that he was asked on cross regarding his stated hope that the officers would collect his clothes for
25  evidence.  Petitioner, who has the burden of establishing a basis for the grant of habeas relief, has not cited
    any case law to this Court that would establish that the particular question that was asked without objection
26  violated the Constitution.

27   [63]As with the fan claim, petitioner seeks to pursue a *Brady-Agurs* claim in the reply with regard to the
    note paper that was not alleged in the amended petition.  The Court's comments in footnote 60 regarding the
28  fan claim apply fully to this claim as well.  Any such *Brady-Agurs* claim further clearly is without merit.

1        ***Ground 5:   Alleged Brady Violations***

2              In Ground 5, petitioner alleges that he was denied due process and a right to a fair trial

3   in violation of the Fifth and Fourteenth Amendments when the State allegedly failed to

4   disclose certain items timely and others at all.[64]

5              Petitioner alleges that the State failed to make timely disclosure in that: (1) the State

6   did not turn over approximately one thousand pages of discovery until three judicial days prior

7   to trial; (2) the State endorsed approximately fifty witnesses only days prior to trial; (3) the

8   defense was unable to interview Correctional Officers Stacy Miller and Larry Adamson until

9   only days prior to trial; (4) the defense was unable to view the crime scene and the lower yard

10  until ten days before trial, and Smith was not allowed to accompany counsel during the visit;

11  and (5) the State did not produce a tape of the initial interview of inmate Watson until several

12  days after Watson had testified.  Petitioner, speaking of the foregoing materials in the main

13  *in globo* rather than separately, contends that the late disclosures prejudiced the preparation

14  and presentation of the defense. Petitioner provides no specifics. Petitioner further maintains

15  that the defense was unable to adequately cross-examine inmate Watson without prior

16  disclosure of the interview tape and that "it is possible" that his testimony could have been

17  impeached with a prior disclosure.  Petitioner provides no specifics as to cross-examination

18  and impeachment that was not pursued to his prejudice due to the late disclosure.[65]

19             Petitioner alleges that the State further wholly withheld: (1) information regarding non-

20  witness confidential informants; and (2) reports of inmate interviews, as the defense was

21  provided only twenty-five of sixty-six reports allegedly sent to the prosecutor. Petitioner urges

22  variously that this material "may have" or "could have" exculpatory and impeachment

23  evidence for the defense. Petitioner refers to the withheld material also only *in globo*, without

24  identifying any specific exculpatory or impeachment information contained therein. #23, at 33;

25  #107, at 20-21.

26  _____

27       [64]Petitioner voluntarily dismissed Ground 4 after the Court held that the claim was unexhausted.

28       [65]#23, at 32; #107, at 19-20.

1    Over and above the foregoing lack of specifics supporting petitioner's *Brady* claims,

2    petitioner further has failed to cite to state court record materials supporting two of the broad

3    claims made regarding the categories that allegedly were produced late or withheld.

4    With regard to the alleged late endorsement of witnesses, N.R.S. 174.234 provides

5    for reciprocal disclosure of case-in-chief witnesses no less than five judicial days prior to trial.

6    Petitioner has not demonstrated either that the State violated this provision as to guilt phase

7    case-in-chief witnesses or, even more significantly, that the State listed guilt phase fact

8    witnesses days before the trial that were a surprise to the defense.  Moreover, the specific

9    record exhibits cited by petitioner do not support his allegations.  The exhibits cited by

10   petitioner reflect only that the prosecution endorsed a total of fourteen additional witnesses,

11   including the listing of one of the  investigators also as an expert witness on gang activity, and

12   only with respect to the penalty phase.[66]  Of the thirteen added fact witnesses for the penalty

13   phase, ten of the witnesses (one of whom was not called) pertained exclusively to Robert

14   Rowland and related principally to Rowland's prior conduct while incarcerated in California.[67]

15   Thus, the specific record exhibits cited by petitioner reflect only that he was presented with

16   a list that included only three additional fact witnesses against him and with regard to the

17   penalty phase only.  Smith does not articulate any specific prejudice by the allegedly late

18   addition of the three penalty phase fact witnesses or the designation of one of the

19   investigators as an expert witness on gang activity.

20   With regard to information concerning non-witness confidential informants, petitioner

21   has not identified herein where the specific request was made for same.  Nor has petitioner

22   established that there were in fact any such non-witness confidential informants.   As

23   respondents outline in the answer, the state court record establishes that the defense was

24   provided requested information regarding the available confidential informant histories for the

25

26   [66]See #40, Exhs. 91, 92 & 94.  The three witnesses listed in Ex. 92 are included within the list of
thirteen witnesses in Ex. 94.  The notice as to the fourteenth witness, Ex. 91, listed one of the prison
27   investigators involved in the principal investigation as an expert witness on gang activity for the penalty phase.

28   [67]Compare #40, Ex. 94, with #56, Ex. 155, and #57, Ex. 156.

-38-

1   inmate witnesses who testified at trial.[68]  Petitioner does not even mention non-witness

2   confidential informants again in the federal reply.  Petitioner has the burden of establishing

3   an entitlement to federal habeas relief, and he has not carried that burden with regard to non-

4   witness confidential informants, if any ever existed in the case.

5         The Supreme Court of Nevada rejected the claims presented to that court on the

6   following grounds:

7           Smith claims that the State's discovery delays and
     nondisclosures violated the <u>Brady</u> standard.[FN9]   <u>Brady v.</u>
8      <u>Maryland</u>[FN10] requires a prosecutor to disclose evidence
     favorable to the defense when that evidence is material either to
9      guilt or punishment.   There are three components to showing a
     successful <u>Brady</u> violation: (1) the evidence at issue must be
10     favorable to the accused; (2) the evidence must be withheld by
     the state, either intentionally or inadvertently; and (3) prejudice
11     must ensue.[FN11]  We conclude that because Smith has failed
     to establish that the discovery and disclosures were exculpatory,
12     withheld, or material, his <u>Brady</u> arguments lack merit.[FN12]

13      [FN9] <u>See Mazzan v. Warden</u>, 116 Nev. 48, 66, 993 P.2d
     25, 36 (2000)(reviewing the district court's determination
14     of whether the State committed a <u>Brady</u> violation de novo).

15      [FN10] 373 U.S. 83, 87 (1963).

16      [FN11] <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82
     (1999).
17

18      [FN12] <u>See Mazzan</u>, 116 Nev. at 66, 993 P.2d at
     36 (noting that a <u>Brady</u> violation is material "if there
19     is a reasonable possibility that the omitted evidence
     would have affected the outcome.").

20   #62, Ex. 187, at 5.

21         The state supreme court's rejection of Smith's *Brady* claims was neither contrary to nor

22   an unreasonable application of clearly established federal law as determined by the United

23   States Supreme Court.

24         Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the

25   prosecution's suppression of evidence favorable to an accused "violates due process where

26   the evidence is material either to guilt or to punishment irrespective of the good faith or bad

27

28      [68]See record materials cited in #102, at 27.

                           -39-

1   faith of the prosecution."   373 U.S. at 87, 83 S.Ct. at 1196.   There are three essential
2   components to a *Brady* claim: (1) "The evidence at issue must be favorable to the accused,
3   either because it is exculpatory, or because it is impeaching," (2) "that evidence must have
4   been suppressed by the State," and (3) "prejudice must have ensued." *Strickler v. Greene*,
5   527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

6          Favorable evidence is material, and its suppression is unconstitutional, "if there is a
7   reasonable probability that, had the evidence been disclosed to the defense, the result of the
8   proceeding would have been different."   *United States. v. Bagley*, 473 U.S. 667, 682, 105
9   S.Ct. 3375, 87 L.Ed.2d 481 (1985).   Reasonable probability is a probability sufficient to
10  undermine confidence in the outcome."   *Id*.   Materiality "must be evaluated in the context of
11  the entire record."   *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342
12  (1972).   The mere possibility that undisclosed material might have helped the defense, or
13  might have affected the outcome, is insufficient to establish materiality in the constitutional
14  sense.   *Id.*, at 109-10.   In addition, in order to be material within the meaning of *Brady*, the
15  undisclosed information or evidence acquired through that information must be admissible.
16  *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir.1989). Petitioner must show how the
17  information or evidence would be both material and favorable to his defense.   *Pennsylvania*
18  *v. Ritchie*, 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 1002 n.15, 94 L.Ed.2d 40 (1987).

19         In the present case, petitioner's claims regarding alleged late disclosure in truth pertain
20  to late disclosure of the State's case rather than late disclosure of exculpatory evidence.
21  Petitioner does not identify any specific exculpatory or impeachment information that was not
22  timely provided to the defense.   Instead, he complains of alleged late receipt of discovery
23  materials, alleged late notice of the State's witness lists, a delayed opportunity to interview
24  two State witnesses, a delayed opportunity to view the crime scene and prison facility that
25  was limited to defense counsel without their clients, and delayed production of a tape of an
26  interview of another State witness.   Given that petitioner has not identified any specific new
27  exculpatory or impeachment content in any of the foregoing, including the interview tape, his
28  complaint in essence is one of delayed discovery of the State's case.

1      Petitioner cites no apposite holding of the United States Supreme Court clearly

2   establishing that the Due Process Clause imposes an obligation on the State to provide timely

3   discovery of its case.  Clearly established Supreme Court law instead is directly to the

4   contrary.  It is long-established law that a defendant does not have a general constitutional

5   right to notice of the evidence that the State will use against him.  *See,e.g., Gray v.*

6   *Netherland*, 518 U.S. 152, 167-68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Weatherford v.*

7   *Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845-46, 51 L.Ed.2d 30 (1977).  The State's

8   representatives are under no constitutional duty to report to the defense all that they learn

9   about the case and about the State's witnesses, and there is no constitutional requirement

10  that the prosecution make a complete and detailed accounting to the defense of all police

11  investigatory work on a case.  *Agurs*, 427 U.S. at 109, 96 S.Ct. at 2400.  As the Supreme

12  Court clearly stated in *Weatherford*, "[t]here is no general constitutional right to discovery in

13  a criminal case, and *Brady* did not create one."  429 U.S. at 559, 97 S.Ct. at 846.

14      Petitioner urges – again only generally – that "[t]hese belated disclosures certainly

15  prejudiced the preparation and presentation of Mr. Smith's defense."[69]  This sort of alleged

16  prejudice, however, speaks more to an alleged prejudice that results from denial or delay of

17  discovery of the State's case rather than from the withholding or delayed production of

18  exculpatory or impeachment evidence.  Such alleged prejudice is not a matter to which *Brady*

19  is directed.  *Brady* instead requires a showing that the defense was denied access to specific

20  exculpatory or impeachment evidence that reasonably probably would have produced a

21  different result.  *Bagley, supra*.  Petitioner has made no such showing as to any of the

22  delayed discovery, including the Watson interview tape. [70]

23  _____

24      [69]#107, at 19, lines 17-18.

25      [70]As to the latter, petitioner has not identified any specific permissible cross-examination, much less
outcome-altering cross-examination, that was not pursued because the defense did not have the interview
26  tape as opposed to the transcript of the very same interview.  The State indisputably produced the transcript
of the interview to defense counsel prior to trial. #49, Ex. 127, at 54, line 15.  Rowland's counsel wanted to
27  obtain and play the entire tape of the interview because of recollection failures and alleged inconsistencies by
Watson.  *Id*., at 53-54.  The state district court – based upon a specific analysis of the relevant evidentiary
28                                                                                            (continued...)

-41-

1    Petitioner therefore failed to present viable *Brady* claims based upon the State's

2    allegedly dilatory discovery and other delayed production or access to evidence.[71]

3    Petitioner also failed to carry his burden of demonstrating that material exculpatory or

4    impeachment evidence was contained within the two generic *in globo* categories of withheld

5    material.  The mere possibility that undisclosed information might have helped the defense,

6    or might have affected the outcome of the trial, is insufficient to establish materiality in the

7    constitutional sense.  *Agurs*, 427 U.S. at 109-10, 96 S.Ct. at 2400.  Mere speculation that a

8    category of materials might possibly include exculpatory or impeachment evidence also does

9    not suffice.  *See, e.g., Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000).  Petitioner offers

10   nothing more here than bald unsupported speculation that information regarding non-witness

11   confidential informants – if any in fact existed – and reports of additional inmate interviews

12   "may have" or "could have" exculpatory and impeachment evidence for the defense.  The

13   Nevada Supreme Court's rejection of such unsupported and speculative *Brady* claims was

14   neither contrary to nor an unreasonable application of clearly established federal law.

15   Ground 5 therefore does not provide a basis for federal habeas relief.

16

17

18   [70](...continued)
     rules – held that the entire interview tape could not be played for the jury in that manner for impeachment.
19   *Id.*, at 55-58.  Evidence that is not admissible is not material for purposes of *Brady*.  *Kennedy*, *supra*.
     Petitioner has not identified any permissible impeachment that the defense was unable to pursue because it
20   had only the transcript rather than the tape of the interview.

21   [71]Moreover, petitioner does not cite any holding of the United States Supreme Court clearly
     establishing that *Brady* requires relief when exculpatory or impeachment evidence is actually disclosed but
22   not until shortly before or at trial.  Under the AEDPA, habeas relief must be denied where Supreme Court
     precedent provides no clear answer to the question presented.   *See, e.g., Wright v. Van Patten*, 552 U.S.
23   120, ___, 128 S.Ct. 743, 747, 169 L.Ed.2d 583 (2008).  Petitioner relies upon a number of circuit decisions
     regarding dilatory disclosure of exculpatory or impeachment evidence, but petitioner's burden is to
24   demonstrate that the decision of the state court is contrary to or an unreasonable application of clearly
     established federal law as determined by the United States Supreme Court not lower federal courts.  In the
25   absence of an apposite Supreme Court holding clearly establishing a *Brady* violation based upon the
     timeliness of the State's production, petitioner would not carry his burden under the AEDPA even if his claims
26   had shown – which they did not – dilatory disclosure of actual exculpatory or impeachment evidence as
     opposed to merely dilatory disclosure of general discovery and general information regarding the case.  *See*
27   *Ibarra v. Ryan*, 2009 WL 319683 (9th Cir., Feb. 6, 2009)(unpublished)(habeas relief denied under the AEDPA
     because *Brady* provides no clear rule authorizing relief when the material is actually disclosed, albeit during
28   the early stages of the trial).

-42-

1    ***Ground 7:   Polygraph Evidence***

2         In the remaining claim in Ground 7, petitioner alleges that he was impeded in his ability

3    to present a defense in violation of his right of confrontation under the Sixth and Fourteenth

4    Amendments when the trial court rejected the introduction of polygraph evidence regarding

5    defense witness Jason Jones without conducting a *Daubert* hearing or otherwise receiving

6    evidence regarding the reliability of the polygraph evidence.[72]

7         Nevada state decisional law at the time of Smith's trial allowed for the admission of

8    polygraph results if, *inter alia*, the parties stipulated in writing to the admission of the

9    polygraph examination.  Absent such a written stipulation, polygraph evidence was properly

10   excluded under Nevada state law.  *See,e.g., Domingues v. State*, 112 Nev. 683, 694, 917

11   P.2d 1364, 1373 (1996); *Corbett v. State*, 94 Nev. 643, 584 P.2d 704 (1978).

12        In the present case, the State did not stipulate to the admission of the polygraph

13   examinations of Jason Jones.  Smith nonetheless moved for admission of the polygraph

14   results.  At the oral argument on the motion, the state district court twice asked Smith's

15   counsel for citation to authority for admission of the polygraph results.  When counsel failed

16   to cite any state and/or federal authority supporting the admission of the polygraph results

17   absent a stipulation, the state district court denied Smith's motion without hearing testimony

18   from petitioner's witness regarding the alleged reliability of polygraph results.[73]

19        The Supreme Court of Nevada rejected the claim presented to that court in a portion

20   of its order addressing a number of arguments:

21             Smith next makes several other arguments . . . [including
             that] the district court erred in denying his motion to admit Jason
22           Jones's polygraph examination . . . .  After a thorough review of
             the record, we conclude that each of these arguments lacks
23           merit.

24   #62, Ex. 187, at 5.

25   _____

26        [72]Petitioner voluntarily dismissed Ground 6 after the Court held that the claim was unexhausted.
     Petitioner also voluntarily dismissed a parallel due process claim under Ground 7 after the Court held that the
27   claim was unexhausted.

28        [73]#38, Ex. 80; #40, Ex. 97; #41, Ex. 100, at 20-21.

                                            -43-

1    At the outset, petitioner urges that this Court must review this ground *de novo* because

2 there allegedly is no state court decision to which to defer.[74]  Petitioner's argument is contrary

3 to controlling Ninth Circuit precedent.  Where the state court decides a claim on the merits

4 but provides no reasoned decision, the federal court conducts an independent review of the

5 record to determine whether the state court's rejection of the claim was either contrary to or

6 an objectively unreasonable of clearly established federal law.  *See, e.g., Musladin v.*

7 *Lamarque*, 555 F.3d 830, 835 (9th Cir. 2009).  Although the federal court independently

8 reviews the record, the court nonetheless still applies the deferential AEDPA standard of

9 review to the state court's ultimate decision rejecting the claim.  *Id.*[75]

10    Under that standard, and following independent review of the record, the Court holds

11 that the Nevada Supreme Court's decision rejecting petitioner's claim was neither contrary

12 to nor an unreasonable application of clearly established federal law as determined by the

13 United States Supreme Court.

14    Petitioner relies upon *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140

15 L.Ed.2d 413 (1998).  *Scheffer*, however, in truth rejects – rather than supports – the

16 fundamental principles that petitioner would need to establish to prevail on this claim.

17    First, *Scheffer* clearly rejects the proposition that a rule restricting admission of

18 polygraph evidence unconstitutionally denies a defendant the right to present a defense.  The

19 accused airman in Scheffer was convicted by general court-martial of drug and other

20 offenses.  Military Rule of Evidence 707 provided that polygraph evidence "shall not be

21 admitted into evidence."  The accused contended that Rule 707 violated his constitutional

22

23    [74]#107, at 23.

24    [75]Petitioner cites *Greene v. Lambert*, 288 F.3d 1081, 1088-89 (9th Cir. 2002), for the proposition that

25 this Court instead should apply *de novo* review because of the purported absence of a state court decision to which to defer.  *Greene* in fact followed exactly the rule stated in the text herein.  That is, the Ninth Circuit

26 sought to determine, following an independent review of the record, whether the state court's rejection of the claim constituted an unreasonable application of clearly established federal law under the AEDPA standard of

27 review.  The court of appeals stated that it applied *de novo* review to the *federal district court's* grant of habeas relief.  Nothing in *Greene* states that a *de novo* standard of review was being applied to the state

28 court decision rejecting the claim, and the court of appeals clearly applied the AEDPA standard of review.

-44-

1   right to present a defense recognized in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704,

2   L.Ed.2d 37 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297

3   (1973); and  *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

4          The Supreme Court, in the majority portions of the principal opinion, which were joined

5   in by eight justices, clearly rejected the proposition that exclusion of polygraph evidence

6   violated the constitutional right to present a defense:

7
8              The three of our precedents upon which the Court of
       Appeals principally relied, *Rock v. Arkansas*, *Washington v.
9      *Texas*, and *Chambers v. Mississippi*, do not support a right to
       introduce   polygraph   evidence,   even   in   very   narrow
10     circumstances.    The exclusions of evidence that we declared
       unconstitutional   in   those   cases   significantly   undermined
11     fundamental elements of the defendant's defense.  Such is not
       the case here.

12                                  . . . . .

13             *Rock*, *Washington*, and *Chambers* do not require that Rule
       707 be invalidated, because, unlike the evidentiary rules at issue
14     in those cases, Rule 707 does not implicate any significant
       interest of the accused.  Here, the court members heard all the
15     relevant details of the charged offense from the perspective of
       the accused, and the Rule did not preclude him from introducing
16     any factual evidence.[FN13]  Rather, respondent was barred
       merely from introducing expert opinion testimony to bolster his
17     own credibility.  Moreover, in contrast to the rule at issue in *Rock*,
       Rule 707 did not prohibit respondent from testifying on his own
18     behalf; he freely exercised his choice to convey his version of the
       facts   to   the   court-martial   members.     We   therefore   cannot
19     conclude that respondent's defense was significantly impaired by
       the   exclusion   of   polygraph   evidence.    Rule   707   is   thus
20     constitutional under our precedents.

21             [FN13] The dissent suggests . . . that polygraph results
       constitute   "factual   evidence."    The   raw   results   of   a
22     polygraph exam - the subject's pulse, respiration, and
       perspiration rates - may be factual data, but these are not
23     introduced at trial, and even if they were, they would not
       be "facts" about the alleged crime at hand.  Rather, the
24     evidence introduced is the expert opinion testimony of the
       polygrapher about whether the subject was truthful or
25     deceptive in answering questions about the alleged crime.
       A *per se* rule excluding polygraph results therefore does
26     not prevent an accused - just as it did not prevent
       respondent here - from introducing factual evidence or
27     testimony about the crime itself, such as alibi witness
       testimony . . . .  For the same reasons, an expert
28     polygrapher's interpretation of polygraph results is not

                                    -45-

> evidence of " 'the accused's whole conduct,' " . . . to which Dean Wigmore referred. It is not evidence of the "'accused's ... conduct'" at all, much less "conduct" concerning the actual crime at issue. It is merely the opinion of a witness with no knowledge about any of the facts surrounding the alleged crime, concerning whether the defendant spoke truthfully or deceptively on another occasion.
>
> For the foregoing reasons, Military Rule of Evidence 707 does not unconstitutionally abridge the right to present a defense.

523 U.S. at 315-17, 118 S.Ct. at 1267-69.[76]

Second, both the majority portions of the principal opinion as well as the concurring opinion – reflecting the views of eight of the justices – firmly reject any suggestion that the requirements of the *Daubert* decision[77] as to admission of expert evidence under the Federal Rules of Evidence are rules of constitutional stature.

The majority portions of the principal opinion stated:

> Until quite recently, federal and state courts were uniform in categorically ruling polygraph evidence inadmissible under the test set forth in *Frye v. United States*, 293 F. 1013 (App. D.C.1923), which held that scientific evidence must gain the general acceptance of the relevant expert community to be admissible. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), we held that *Frye* had been superseded by the Federal Rules of Evidence and that expert testimony could be admitted if the district court deemed it both relevant and reliable.
>
> Prior to *Daubert*, neither federal nor state courts found any Sixth Amendment obstacle to the categorical rule. . . . . Nothing in *Daubert* foreclosed, as a constitutional matter, *per se* exclusionary rules for certain types of expert or scientific evidence. It would be an odd inversion of our hierarchy of laws if altering or interpreting a rule of evidence worked a corresponding change in the meaning of the Constitution.

523 U.S. at 311 n.7, 118 S.Ct. at 1265-66 n.7 (additional citations omitted).

---

[76]See also 523 U.S. at 318, 118 S.Ct. at 1269 (Kennedy, J., concurring)("If we were to accept respondents's position [which the Court did not] . . . our holding would bind state courts, as well as military and federal courts.")

[77]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

1    Justice Kennedy echoed this view in his concurring opinion.  He noted that while "there

2 is some tension between [the federal evidence] rule and our holding today," it nonetheless

3 remained true that "the considerable discretion given to the trial court in admitting or excluding

4 scientific evidence [under *Daubert*] is not a constitutional mandate."  523 U.S. at 318, 118

5 S.Ct. at 1269.

6    *Scheffer* thus rejects – rather than supports – the two fundamental premises underlying

7 petitioner's  claim.   *Scheffer*  rejects  the  proposition  that  exclusion  of  polygraph  evidence

8 violates a defendants right to present a defense.  And *Scheffer* further rejects any notion that

9 the Constitution requires judges to follow *Daubert* when considering whether to admit expert

10 or scientific evidence.

11   Petitioner urges that a majority in *Scheffer* questioned the wisdom of *per se* exclusion

12 of polygraph evidence, referring to Justice Kennedy's concurring opinion for four justices, 523

13 U.S. at 318, 118 S.Ct. at 1269, and presumably to the lone dissenting justice.  It is axiomatic,

14 however, that what the justices of the Supreme Court believe to be wise or unwise is not the

15 measure of what is constitutional.[78]  This is all the more true as to a decision in which eight

16 justices clearly have rejected the corresponding constitutional challenge.

17   Petitioner  further  suggests  that  the  present  case  is  distinguishable  from  *Sheffer*

18 because Military Rule of Evidence 707 provided for a *per se* exclusion of polygraph evidence

19 whereas Nevada case law allows for the introduction of polygraph evidence upon a stipulation

20 by the parties (which petitioner did not in fact have in this case).  It would be highly unusual,

21 however, for the United States Supreme Court to hold that a complete bar upon the

22 admission of a type of evidence did not unconstitutionally deprive a defendant of the right to

23 present a defense but that a less categorical bar (absent some impermissible criterion such

24

25    [78]*See,e.g., Marshall v. Lonberger*, 459 U.S. 422, 438 n.6, 103 S.Ct. 843, 853 n.6, 74 L.Ed.2d 646
(1983)("the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the
26 wisdom of state evidentiary rules"); *Maher v. Roe*, 432 U.S. 464, 479, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484
(1977)(*quoting  Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955))
27 ("Our conclusion that the Connecticut regulation is constitutional is not based on a weighing of its wisdom or
social desirability, for this Court does not strike down state laws 'because they may be unwise, improvident,
28 or out of harmony with a particular school of thought.'.").

-47-

as race) upon admission of the evidence did.  The state courts held that petitioner had not satisfied the purely state law requirements for admission of polygraph evidence, and *Scheffer* strongly supports, if not indisputably compels, the view that the exclusion of the evidence does not violate the constitutional guarantee of a right to present a defense.  Petitioner's burden on AEDPA review is not merely to distinguish *Scheffer* in some minor respect but instead to demonstrate that the state supreme court's rejection of his claim was an objectively unreasonable application of the Supreme Court precedent.

At bottom, the Nevada Supreme Court's rejection of petitioner's claim was neither contrary to nor an unreasonable application of *Scheffer*.  Petitioner has not come forward with any apposite case law from the United States Supreme Court in any way tending to establish otherwise.

Ground 7 therefore does not provide a basis for habeas relief.[79]

**Ground 8: Effective Assistance of Trial Counsel**

In Ground 8, petitioner presents multiple claims of ineffective assistance of trial counsel, which are discussed below as subparts (a), (b), and (c).

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done

_____

[79]Petitioner further maintains, without any citation to supporting record materials, that "[t]he prosecution built the case against Mr. Smith by employing polygraph tests." #107, at 22-23.  Particularly given the variances between petitioner's counsel's factual statements in this Court and the state court record that have been noted previously herein, the Court is unable to take such an unsupported statement on faith.  The mere use of polygraph examination during the State's investigation, without more, would not necessarily make the exclusion of polygraph evidence at the subsequent trial unconstitutional or the state high court's rejection of the claim an objectively unreasonable application of *Scheffer*.  Petitioner's relies upon Justice Kennedy's discussion of the inconsistency between the federal government's use of polygraph testing for security determinations and its argument in *Scheffer* that polygraph tests were inaccurate.  See 523 U.S. at 318, 118 S.Ct. at 1269.  This reliance is misplaced given that, once again, Justice Kennedy nonetheless joined the eight-justice majority holding that the exclusion of the polygraph evidence *did not violate the Constitution*.  Justices' discussions of what is wise, consistent or trend-setting, again, do not constitute the measure of what is constitutional.

-48-

1   differently but rather is whether counsel's decisions were reasonable from his perspective at

2   the time.  The  court starts from a strong presumption that counsel's conduct fell within the

3   wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate

4   a reasonable probability that, but for counsel's unprofessional errors, the result of the

5   proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08

6   (9th Cir. 2003).

7        ***Ground 8(a):   Effective Assistance -- The Holmes Fan***

8        In Ground 8(a), petitioner alleges that he was denied effective assistance of trial

9   counsel in violation of the Sixth and Fourteenth Amendments when counsel allegedly failed

10  to investigate evidence regarding the Holmes fan that is discussed under Ground 3.

11       Additional background and discussion regarding the Holmes fan is found, *supra*, at 27-

12  29 and 33-34.

13       Petitioner alleges in particular that trial counsel (a) should have located the former

14  inmate from whom he allegedly obtained the fan so that the inmate could corroborate Smith's

15  testimony that he obtained the fan from the inmate and that it was an oscillating rather than

16  a box fan; and (b) should have sought to obtain prison records with specific identifying

17  information for the respective fans purchased by the inmate and Silva in order to confirm that

18  the fan that Smith had was obtained from the inmate rather than stolen from Silva.

19       In the state post-conviction proceedings, the state district court appointed counsel for

20  petitioner, and the court gave petitioner an opportunity to present evidence supporting his

21  ineffective assistance claims at an evidentiary hearing.

22       At the hearing, defense co-counsel Allison Joffee testified that no effort was made to

23  determine whether the serial number on Silva's fan matched the one recovered from Smith's

24  cell because "[t]he fan was gone" and "[i]t hadn't been collected as evidence."  Defense

25  counsel relied upon the property officer's statements and testimony that records were not

26  kept as to property that had been given away.   She agreed on cross-examination with the

27  statement that the testimony of the State's witnesses did not hinge upon the existence or

28  nonexistence of the fan.  #63, Ex. 199, at 20-23 & 70.

-49-

1    According to Smith's testimony, he obtained the fan from "a guy that was a prisoner"
2  that inmates called "Tex."  His name "was something like the Pope's name, like John Paul
3  Johnson, or something like that."  Smith maintained that the prison kept records of the serial
4  numbers of purchased items, and that he explained this to counsel who did not follow up.[80]

5    Petitioner did not introduce copies of any prison records at the evidentiary hearing
6  showing the serial numbers of the fans purchased by Silva and the other inmate.  Nor did
7  petitioner present copies of any prison records showing that the serial number of the donated
8  fan had been recorded.  Nor did petitioner present any testimony by a former inmate named
9  "Tex," or "John Paul Johnson, or something like that" establishing that he could have been
10  located at the time of the trial, that he would have been available to testify, and that he would
11  have provided favorable testimony that Smith obtained an oscillating fan from him.

12    The last reasoned decision as to this claim is the Nevada Supreme Court's decision
13  on the appeal from the denial of state post-conviction relief.  The state supreme court did not
14  address the claim actually presented by petitioner, however.  The state high court addressed
15  the claim as if petitioner were alleging ineffective assistance on the basis that counsel failed
16  to attempt to locate the fan itself, which had been disposed of.[81]  That was not the claim
17  presented by petitioner, however.  He instead based the claim on the failure of counsel to
18  locate and present the testimony of the other inmate and to obtain and present prison records
19  showing the serial numbers of the fans in question.[82]  He did not claim that counsel should
20  have attempted to locate the fan after it had been donated to a charity.  Because the
21  Supreme Court of Nevada did not address the claim actually presented by petitioner, this
22  Court will review the claim de novo.

23    On de novo review, petitioner did not demonstrate the requisite prejudice on this claim,
24  for two reasons.

25  

26    [80] #63, Ex. 199, at 122-25.

27    [81] See #64, Ex. 207, at 4-5.

28    [82] See, e.g., #63, Ex. 200; #64, Exhs. 204 & 206.

-50-

First, when given the opportunity to present evidence supporting this claim at the state evidentiary hearing, petitioner did not present competent evidence tending to establish that the result of the investigation in fact would have produced material favorable evidence.

Petitioner did not present competent evidence that prison records actually showed the serial numbers on the fans purchased by Silva and by "Tex."  The inmate property records introduced at trial only haphazardly set forth the actual serial number of the fans and other electrical items listed.[83]  It is not clear that the number "281" on Silva's inmate property card entry for his fan was a serial number.  Other entries on other cards that clearly listed a serial number for a Holmes box fan instead reflected a different format for the serial number as in, *e.g.,* HAB-357.[84]  While Smith – who clearly was not the custodian of any prison records – testified at the evidentiary hearing that prison records showed the serial numbers, it is entirely speculative whether there were prison records, from the canteen or otherwise, that in fact recorded the serial numbers of fans purchased by Silva and by "Tex."

Moreover, even more to the point, petitioner did not present any evidence that the serial number was preserved from the fan that was recovered from his cell and later donated to charity.  Having the serial numbers for fans purchased by Silva and "Tex" would be of only marginal value without also being able to establish the serial number of the fan recovered from Smith's cell.  None of the paperwork presented at trial regarding the fan recovered from Smith's cell reflected the serial number of that fan.[85]

Nor did petitioner present any evidence that the released inmate "Tex" could have been located at the time of trial, that he then would have been available to testify, and that he in fact would have testified as petitioner alleges that he would.  Petitioner did not even have a definite name for "Tex" other than that his name "was something like the Pope's

---

[83]See,e.g., #67, Ex. 237 (trial exhibit 94A)(on Richard Irvine's property card, four of the five listed electrical items, including a fan, do not show a serial number ).

[84]See #67, Ex. 239 (trial exhibit 94D)(entry for a fan purchased by Smith months after the murder).

[85]See #67, Ex. 235 (trial exhibit 92).

name, like John Paul Johnson, or something like that." It is entirely speculative as to whether trial counsel would have been able to track down "Tex" based upon this vague information, whether "Tex" then would have been available to testify, and whether "Tex" in fact would have testified as Smith alleges that he would have.

A petitioner does not carry his burden of proof under *Strickland* simply by pointing to possible investigative leads available to the defense and arguing that the leads should have been pursued further prior to trial. He instead must come forward with evidence tending to establish that, if the leads had been pursued further prior to trial, the investigation would have produced significant exculpatory evidence that, viewed objectively, reasonably probably would have led to a different outcome. Speculation and conjecture that defense investigative leads may have led somewhere does not carry petitioner's burden of establishing resulting prejudice from the alleged failure to investigate further. In the present case, petitioner did not present evidence at the evidentiary hearing that would carry his burden of demonstrating prejudice because he did not present competent evidence that further investigation in fact would have produced significant exculpatory evidence regarding the Holmes fan.

Second, petitioner has not established that there was a reasonable probability that any evidence demonstrating that he did in fact obtain the fan from "Tex" would have altered the outcome at trial. Petitioner urges that the State strongly relied on the proposition that Smith possessed Silva's fan, that "the jury was bombarded with unsupported statements" that Smith was in possession of Silva's fan, and that the State "stressed its fan theory to the jury" because of an allegedly otherwise weak case.[86] As the Court's discussion of the related Ground 3 reflects, petitioner overstates the significance of the fan to the State's case. The State in truth presented no evidence that the fan recovered from Smith was Silva's fan, and Correctional Officer Adamson's misstatement in this regard was promptly corrected by the prosecution. With the Holmes box fan being fairly ubiquitous in the prison and with unauthorized possession of property also being fairly common, proof that Smith had a

---

[86]#107, at 25, lines 6-7, 22-23 & 25-26.

1    Holmes fan that he was not supposed to have hardly constituted a significant or critical link

2    in the State's case.  The prosecutor argued that the fan may have had inculpatory value in

3    closing argument and on appeal only in response to the defense effort to avoid a conviction

4    based upon the loss of allegedly exculpatory evidence.  There is not a reasonable probability

5    that defense evidence conclusively knocking out such a weak to nonexistent – rather than

6    crucial – evidentiary link  in the State's case would have affected the outcome at trial.[87]

7         Petitioner therefore failed to demonstrate the requisite prejudice on this *Strickland*

8    claim.

9         Accordingly, on *de novo* review, Ground 8(a) does not provide a basis for federal

10   habeas relief.

11        ***Ground 8(b):   Effective Assistance -- Proper Person Opening Statement***

12        In Ground 8(b), petitioner alleges that he was denied effective assistance of trial

13   counsel when counsel allegedly improperly encouraged him to make his own opening

14   statement to the jury.

15        The state district court interpreted the provisions of Nevada state law in N.R.S.

16   175.141 as allowing a represented defendant to present his own opening statement.  Smith

17   did so in this case.[88]

18        At the evidentiary hearing on state post-conviction review, defense co-counsel Allison

19   Joffee testified that she believed that it was her co-counsel, William Rogers, who initially had

20   the idea for Smith to present his opening statement.  Defense counsel had sought to have

21   a seven-to-five majority of women on the jury (the jury ultimately seated was composed of ten

22   women and two men) because they believed that Smith related well to women.   They

23   believed that Smith would relate to the jurors better than the prosecutor, who they believed

24   was treating jurors poorly.  Counsel also wanted to present as early as possible Smith's side

25   of the story regarding his gang involvement.  Counsel believed that the trial court would allow

26

27        [87]See text, *supra*, at 33-34 & nn. 58-59.

28        [88]See #23, Ex. 118, at 27 (court) & 89-92 (Smith).  *But cf.* #64, Ex. 207, at 7 n.16 (quoted *infra*).

1  the introduction of gang evidence over defense objection.  Counsel therefore attempted "to
2  take the lead and . . . attack it ourselves."  Counsel advised Smith of the dangers of providing
3  his own opening statement.  They provided him with an outline or script to follow.[89]

4       Defense co-counsel Rogers testified as follows.  Counsel advised Smith of the pros
5  and cons of making his own opening statement, and the ultimate decision to do so was made
6  by Smith.  According to Rogers' recollection, Smith wrote his opening and counsel then
7  suggested revisions.[90]

8       Smith testified as follows at the evidentiary hearing.  According to Smith, it was Joffee's
9  idea for him to make his own opening statement.  He initially resisted the idea because he
10  did not like speaking before large groups.  Counsel ultimately persuaded him to give his own
11  opening statement, and Joffee wrote the statement for him.  He acknowledged both that
12  counsel advised him of the advantages and disadvantages of giving his own opening
13  statement and that counsel told him that it was his decision to make.[91]

14       During the State's opening statement at trial – prior to Smith making his own opening
15  statement – the prosecutor referred to the defendants' gang affiliation and to attacks by gang
16  members on witnesses seeking to intimidate them into not testifying for the State.[92]

17       The Supreme Court of Nevada rejected the claim presented to that court on the
18  following grounds:

19            Smith further contends that the district court improperly
             denied his claim that his trial counsel were ineffective for advising
20            him to give his own opening statement.  And he contends that his
             trial counsel should have made sure that he did not give the
21            opening statement without first being canvassed by the district
             court about the dangers of self-representation pursuant to Faretta
22            v. California.[FN15]

23

24 ────────────────────
        [89]#63, Ex. 199, at 24-32 & 72 (page 25 of the transcript is out-of-order in the transcript and comes
25  after page 26 rather than 24).  See also #56, Ex. 153 (list of jurors).

26        [90]#63, Ex. 199, at 101 & 112.

27        [91]#63, Ex. 199, at 125-29.

28        [92]#44, Ex. 118, at 62-64 & 77-80.

Smith's trial counsel, Joffee, testified during the evidentiary hearing that she advised Smith to make his own opening statement, but that she also cautioned him about the dangers of doing so. She also testified that she discussed with Smith the contents of his opening statement and provided him with a script of what to say. Smith's other trial counsel, Rogers, testified during the hearing that Smith wrote his own opening statement, but that he reviewed it. And Smith testified during the evidentiary hearing that Joffee provided him with a script of what to say and that he ultimately agreed to make his own opening statement.

At no time did Smith relinquish his right to counsel or go without the services of his appointed counsel. Rather, the content of his opening statement was both prepared and reviewed by his trial counsel and they were present during the opening statement and throughout his trial. Canvassing Smith pursuant to <u>Faretta</u> was therefore not mandated, and his trial counsel were not ineffective for failing to ensure that this was done.

Additionally, assuming that Smith has overcome the strong presumption that his trial counsel's advice on this matter fell within the range of reasonable trial strategy,[FN16] he has failed to specify what he said during his opening statement that his trial counsel would not have said if they had given it. We note particularly that Smith chose later in the trial to testify consistently with his opening statement, essentially negating any possible prejudice from his opening statement. We conclude that relief on this claim was properly denied by the district court.

[FN15] [Citations omitted.]

[FN16] <u>See Strickland</u>, 466 U.S. at 690-91; cf. <u>Wheby v. Warden</u>, 95 Nev. 567, 568-69, 598 P.2d 1152, 1153 (1979)("We have previously determined that although a criminal defendant may have both a right of self-representation and a right to assistance of counsel, this does not mean that a defendant is 'entitled to have his case presented in court both by himself and by counsel.'")(quoting <u>Miller v. State</u>, 86 Nev. 503, 506, 471 P.2d 213, 215 (1970)), overruled on other grounds by <u>Keys v. State</u>, 104 Nev. 736, 766 P.2d 270 (1988).

Because neither party on appeal challenges the district court's interpretation of NRS 175.141 that a defendant who is represented by counsel may still give his own opening statement, we do not reach this issue.

#64, Ex. 207, at 6-7.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

-55-

1      First, a determination that counsel did not provide deficient performance was not an

2   objectively unreasonable application of *Strickland*.  The decision to recommend to Smith that

3   he give his own opening statement, while unorthodox, clearly was a considered strategic

4   decision by trial counsel.  Such a considered strategic decision by trial counsel is virtually

5   unassailable under *Strickland*.  *See* 466 U.S. at 681, 104 S.Ct. at  2061.[93]

6      Second, a determination that petitioner did not establish resulting prejudice also was

7   not an objectively unreasonable application of *Strickland*.

8      Petitioner urges that the result of Smith's opening statement "were devastating when

9   taken in light of the terror expressed by the jurors at the end of the guilt phase."  Petitioner

10  contends that the jurors were terrified by the fact that Smith was a gang member and that

11  they instead would have been able to properly weigh the merits of his defense if only he had

12  not improperly presented his gang affiliation in his opening statement.[94]

13     However, a state court determination that there was not a reasonable probability that,

14  but for Smith's discussion of these matters in his opening statement, the outcome at trial

15  would have been different was not an objectively unreasonable application of *Strickland*.  As

16  discussed further below with regard to Ground 8(c), jurors expressed fear at the end of the

17  guilt phase after hearing extensive trial testimony of intimidation practiced by the GFBD gang

18  and at times affiliated prison gangs generally as well as of multiple specific acts of violence

19  inflicted upon witnesses in an effort to intimidate them from testifying.  Over and above a fear

20  by jurors generally following entry of a guilty verdict, the particular jury in Smith's case had

21

22     [93]Petitioner tendered with the federal reply a September 2008 sworn declaration by a deputy public
23  defender in Nevada reflecting his opinion that, *inter alia*, the decision to have the client provide his own
    opening statement was improper, unreasonable, and ineffective. #107-2, Ex. 300.  It does not appear that this
24  evidence was presented to the state courts, where petitioner was appointed post-conviction counsel and
    granted an evidentiary hearing.  The affidavit in any event does not establish, on deferential review under the
25  AEDPA, that the Nevada Supreme Court's rejection of the claim was an objectively unreasonable application
    of the performance prong of *Strickland*.  A determination that the considered strategic decision of counsel fell
26  within the wide range of presumptively reasonable conduct was not an objectively unreasonable application of
    *Strickland*, notwithstanding the opinion of the declarant that he did not believe that such was a wise course to
27  follow.

28     [94]#107, at 27, lines 17-23.

-56-

1   abundant material from the trial evidence to give them potential cause for concern.  This trial

2   evidence of gang violence and intimidation likely was going to be admitted into evidence

3   without regard to what Smith said in his opening statement, and, indeed, the prosecutor

4   already had referred to the gang violence in her opening statement.  There was not a

5   reasonable probability that Smith's efforts in his opening statement to explain away and justify

6   his involvement in the gang – as opposed to the extensive violence actually practiced by the

7   gang according to the trial testimony – was what generated fear in jurors.  In all events, a

8   determination that there was not a reasonable probability that the verdict rendered by the jury

9   would have been different but for Smith's opening statement was not an objectively

10   unreasonable of *Strickland*'s prejudice prong.

11       Ground 8(b) therefore does not provide a basis for federal habeas relief.

12       ***Ground 8(c):   Effective Assistance -- Failure to Move for Mistrial***

13       In Ground 8(c), petitioner alleges that he was denied effective assistance of trial

14   counsel when counsel failed to move for a mistrial due to the jury's alleged prejudice toward

15   Smith and his counsel.  He alleges in particular that counsel should have moved for a mistrial

16   following upon a note sent by the jury between the guilt and penalty phases expressing fear

17   for their safety from the prison gangs and following the trial court's action thereon.

18       Extensive evidence was presented at trial of the culture of intimidation practiced

19   generally by the GFBD gang and by other prison gangs that at times were either affiliated with

20   or were cooperating with the GFBD gang for a particular reason, such as for retaliation

21   against informants.  Evidence also was presented of multiple specific acts of violence inflicted

22   upon witnesses in the present case in an effort to intimidate them from or to retaliate against

23   them for cooperating with the State.  Attacks upon inmate witnesses occurred after discovery

24   from the case was released out into the general prison population, although defense counsel

25   and Smith denied any involvement in the discovery getting out onto the yard.[95]

26   _____

27       [95]See,e.g., #48, Ex. 126, at 88-99 & 112-13 (testimony by inmate Watson regarding attack by
    Rowland against him for cooperating with the State); #49, Ex. 127 at 4-6, 34-52 & 58-76 (related testimony);

28                                                                          (continued...)

1    The jury returned guilty verdicts on the charges against Smith and Rowland at

2    approximately 3:17 p.m. on May 4, 1999.  Approximately a half hour later, prior to the

3    commencement of the penalty phase, the trial judge received a note indicating that most of

4    the jurors were concerned about their safety.  Their concern was based upon the belief that

5    the defendants knew their names, that there were gang members who were no longer

6    incarcerated, and that there had been a large number of people watching the trial.  The trial

7    judge informed the jury in open court, *inter alia*, that the daily transcripts from the voir dire had

8    not been provided by counsel to anyone, that the transcripts of the voir dire, related jury

9    selection materials, and the verdict were being sealed.  During the statements by the judge,

10

11        [95](...continued)
#50, Ex. 128, at 85-92 (correctional officer's testimony regarding prison gangs generally, the GFBD gang, and
the defendants' involvement in the gang and gang activities); #50, Ex. 129, at 8-16 & 31-33 (related testimony
and testimony as to investigation of intimidation/retaliation attack on inmate Wade); #51, Ex. 131, at 21-42,
50, 53-68 & 73-83 (testimony by inmate Reid regarding threats and violence by GFBD gang members
regarding his rooming with a black cell mate, threats and intimidation against him for cooperating with the
State, and statements by Rowland regarding putting "hits" out on inmate witnesses and investigating officers
named in the discovery); #51, Ex. 132, at 12-14 & 29-36 (related testimony by Reid); *id.*, at 52-54, 68-76, 106-
10, 117, 123-28, 132, 134, & 142-45 (testimony by inmate LaPeire regarding Rowland orchestrating their
becoming cell mates and then forcing him to have sex with him, other acts of violence and intimidation by
Rowland against others, Smith being a "shot caller" for the gang, a note by Rowland in LaPeire's address
book that LaPeire interpreted as an implied threat of harm to his mother, and an attempt to force him to
recant his inculpatory statements); #52, Ex. 136, at 6, 12, 49-53, 64-65, 73-75 & 85-86 (related testimony by
LaPeire); #52, Ex. 137, at 22-24 (more related testimony by LaPeire); *id.*, at 82-101, 107-119 & 129-30
(investigator's testimony regarding gang intimidation, the discovery documents getting onto the yard, specific
retaliation/intimidation attacks on inmate witnesses, the State's discovery of the gang's plan to eliminate
witnesses, and its response of moving inmate witnesses out of state); #53, Ex. 138, at 10-14, 20-25 & 49-54
(related testimony by another investigator regarding gang involvement, witness intimidation, and attack on
inmate Watson); #53, Ex. 139, at 109-23 (testimony by inmate Wade regarding the discovery being spread
onto the yard and his then being attacked for cooperating with the State); #53, Ex. 141, at 8-36, 42-60& 62-78
(related testimony by Wade); *id.*, at 80 (stipulation that the State had provided discovery, including witness
statements, to defense counsel that then was forwarded to the defendants); *id.*, at 87-98, 110-25 & 127
(testimony by inmate Springfield regarding gang activities seeking to keep a white cell mate from rooming
with him and general intimidation, specific intimidation of witnesses in the case, his being attacked for
cooperating with the State, and statements by Rowland and others about a hit list on officers and witnesses);
#111, Ex. 142-S, at 5, 8-12 & 20 (related testimony by Springfield); *id.*, at 45-50, 55-58 & 62-69 (testimony by
inmate Clingempeel regarding his fear of the defendants following his ultimate refusal to provide false
testimony for them, the discovery being on the yard, and various inculpatory or threatening statements by the
defendants and/or others, including statements regarding attacks on inmates Wade and Watson).

        The evidence reflected in the foregoing record citations is too extensive to summarize here without
further lengthening an already lengthy order.  By referring to this extensive evidence only in broad brush, the
Court does not intend to minimize either the pervasiveness or the significance of the corresponding trial
evidence referred to in the brief statements in the text.

a juror interjected (following upon a trial in which unsolicited juror comments had not been an infrequent occurrence) that their names had been heard by the audience at the time of the verdicts.[96]

As the judge was responding that he was going to discuss with the jurors who had been in the audience, Smith's co-counsel Joffee apparently uttered a nervous laugh, leading to the following exchange:

> A JUROR:        I don't think it's funny.
>
> THE COURT:      No.
>
> A JUROR:        You can sit over there and laugh about it?
>
> THE COURT:      Just a second, just a second.
>
> A JUROR:        Bullshit.

#55, Ex. 150, at 10.

The trial judge then continued with his explanation, *inter alia*, that there had been no inquiries into court records, that the defendants were strip-searched each day and had no documents or notes on them, that the audience had included only people legitimately connected with the case in some respect, and that the GFBD gang was a small fractionalized group to the best of his knowledge.[97]

The judge then spoke with the jury on the record but with counsel and the defendants absent.  The judge engaged in a discussion with the jurors on substantially the same points addressed when all parties were present.  During that discussion, one of the jurors stated that the juror did not think "it was very appropriate for Miss Joffee to find that humorous" and another juror concurred that it was "[v]ery unprofessional."  The judge stated that they would discuss that after the case was done.  The judge gave the jurors an opportunity to think about their concerns, and he stated that he would let any juror go who did not want to proceed forward.  No jurors opted out. #55, Ex. 150, at 15-20; #56, Ex. 155, at 9.

---

[96]#56, Ex. 153; #55, Ex. 150, at 3 & 8-10.

[97]#55, Ex. 150, at 10-12.

1       The next morning, Smith's counsel moved alternatively for a two-week continuance so
2   that the defense could rebut the jurors' safety concerns, impanelment of a new jury, or the
3   trial of the penalty phase to a three-judge panel on stipulation.  Counsel based the motion on
4   the jurors' expressed fears and the juror's reaction to her nervous laugh.  After hearing
5   argument, the trial court denied the motion.[98]

6       At the state post-conviction evidentiary hearing, defense co-counsel Joffee testified,
7   *inter alia*, that the defense made the motion that it did to protect the record but that they
8   wanted the jury that they had for the upcoming penalty phase.  It was their belief – which
9   proved to be the case – that the jury selected would not impose the death penalty.  She
10  further stated that juror concerns about safety were fairly typical following a guilty verdict and
11  that she did not believed that these fears were the basis for the verdicts.[99]

12      The Supreme Court of Nevada rejected the claim presented to that court on the basis
13  that petitioner had failed to demonstrate that a motion for mistrial had any reasonable
14  likelihood of success.[100]

15      The state supreme court's rejection of this claim was neither contrary to or an
16  unreasonable application of clearly established federal law.

17      First, a determination that petitioner failed to demonstrate deficient performance was
18  neither contrary to nor an unreasonable application of clearly established federal law.
19  Although defense counsel made a motion to protect the record, counsel proceeded according
20  to a strategic determination that counsel believed, ultimately correctly, that the jury selected
21  would not impose the death penalty.  Counsel in a capital case of course must make strategic
22  decisions with an eye not only to the guilt phase but also to the penalty phase.

23      Second, a determination that petitioner failed to demonstrate resulting prejudice from
24  the failure to move for a mistrial was neither contrary to nor an unreasonable application of

25
26      [98]#56, Ex. 155, at 9-19.

27      [99]#63, Ex. 199, at 52-56 & 76-78.

28      [100]#64, Ex. 207, at 10-11.

-60-

clearly established federal law.  Petitioner did not establish that there was a reasonable probability that a mistrial either would have been granted by the trial court or ordered by a reviewing court.  Petitioner cites no apposite state or federal case law holding that a mistrial would have been required in the circumstances presented. Cases in which jurors have concerns for their safety after rendering a guilty verdict and/or in which jurors think the behavior of counsel to be unprofessional at some point are neither uncommon nor atypical.

Ground 8(c) therefore does not provide a basis for federal habeas relief.[101]

### *Ground 9: Effective Assistance of Appellate Counsel*

In Ground 9, petitioner presents multiple claims of ineffective assistance of appellate counsel, which are discussed below as subparts (a), (b), and (c).

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Effective appellate advocacy requires weeding out weaker issues with less likelihood of success.  The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason – because the omitted issue has little or no likelihood of success on appeal.  *Id.*

### *Ground 9(a):   Effective Assistance -- Juror Fear*

In Ground 9(a), petitioner alleges that he was denied effective assistance of appellate counsel when counsel failed to raise an issue on appeal concerning jurors' concerns for their safety and/or as to defense counsel's unprofessional laugh.

The underlying factual circumstances are summarized, *supra*, in the discussion of Ground 8(c).  The Supreme Court of Nevada rejected this claim on the ground that, following

---

[101]The heading for Ground 8 in both the amended petition and reply refer to purported claims that trial counsel "elicited testimony from Mr. Smith that he was a 'predator'" and "failed to move for severance of the penalty phase." #23, at 35; #107, at 23.  Nothing further is said as to these purported claims in the body of either the amended petition or the reply.  Phrases in a heading do not satisfy the requirements of Rule 2 of the Rules Governing Section 2254 Cases that habeas claims be pled with particularity.  *See Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 62 L.Ed.2d 582 (2005).  These sentence-fragment "claims" in the heading therefore are disregarded.

upon its discussion of the merits of the underlying claim in rejecting the corresponding claim of ineffective assistance of trial counsel, any failure to raise the merits issue on appeal would not entitle petitioner to relief on the claim of ineffective assistance of appellate counsel.[102] The state supreme court's rejection of this claim for lack of prejudice was neither contrary to nor an unreasonable application of *Strickland*.  Petitioner, who has the burden of proof on state and federal post-conviction review, has cited no apposite state or federal case law holding that a reversal of the conviction was required in the circumstances presented.  As the Court's comments under Ground 8(c) suggest, juror concerns about safety and/or opinions that counsel have acted unprofessionally are not uncommon or atypical occurrences.

Ground 9(a) therefore does not provide a basis for federal habeas relief.

### Ground 9(b):   Effective Assistance -- Ex Parte Meeting with Jurors

In Ground 9(b), petitioner alleges that he was denied effective assistance of appellate counsel when counsel failed to raise an issue on appeal concerning the state trial judge's *ex parte* (but on-the-record) meeting with jurors.

The underlying factual circumstances on this claim as well are summarized, *supra*, within the discussion of Ground 8(c).

The Supreme Court of Nevada rejected this claim on the following grounds:

> [Smith] contends that his appellate counsel were ineffective for failing to raise the issue as to whether the district court improperly engaged in an ex parte meeting with the jury. Although there is some indication in the record that the district court had ex parte contact with the jury, such contact is not improper "when a 'judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication,' and the judge promptly notifies 'the parties of the substance of the ex parte communication and allows an opportunity to respond.'" We conclude that Smith has failed to demonstrate that any ex parte contact by the district court with the jury was improper and that this issue on appeal had any likelihood of success.

#64, Ex. 207, at 12-13 (citation to state case law and judicial ethics canon omitted).

/ / / /

---

[102]#64, Ex. 207, at 12.

1   Petitioner has not demonstrated that the state supreme court's rejection of this claim
2   was either contrary to or an unreasonable application of clearly established federal law.
3   Petitioner cites case law establishing the general right of a defendant to be present at all
4   critical stages of a criminal proceeding.   Petitioner cites no apposite state or federal
5   constitutional case law, however, establishing that the limited, on-record meeting conducted
6   by the trial judge with the jury in this case, without objection, required that the conviction be
7   overturned.[103] Petitioner thus has failed to demonstrate that the state supreme court's
8   rejection of this claim for lack of prejudice was either contrary to or an unreasonable
9   application of *Strickland*.

10   Ground 9(b) therefore does not provide a basis for federal habeas relief.

11   ***Ground 9(c):   Effective Assistance -- Lack of a Faretta Canvass***

12   In Ground 9(c), petitioner alleges that he was denied effective assistance of appellate
13   counsel when counsel failed to raise an issue on appeal concerning the state district court's
14   failure to conduct a *sua sponte Faretta*[104] canvass prior to his proper person opening
15   statement.

16   The underlying factual circumstances are summarized, *supra*, in the discussion of
17   Ground 8(b).  The Supreme Court of Nevada rejected the present claim on the ground that,
18   following upon its discussion of the merits of the underlying claim in rejecting the
19   corresponding claim of ineffective assistance of trial counsel, any failure to raise the merits

20

21   [103]Petitioner cites *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), for the broad
     proposition that "[a] defendant has a constitutional right to be present at all critical stages of the proceeding
22   which includes communications with a deliberating jury." #107, at 30.  The jury in this case was not in
     deliberations at the time of the *ex parte* communication.  The jury had rendered a verdict as to guilt, and the
23   next step in the case was opening statements for the penalty phase.  The cited portion of the  *Illinois v. Allen*
     decision further did not concern communications with a jury during deliberations.

24

25   Petitioner further relies upon *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1
     (1975).  *Rogers* made no constitutional holding applicable to the States, however.  *Rogers* held that the
26   federal district court violated Rule 43 of the Federal Rules of Criminal Procedure when the court unilaterally
     responded to a jury note from a deliberating jury without advising counsel of the communication.  Federal
27   criminal decisions decided on a non-constitutional ground are not binding on the States in the first instance,
     and *Rogers* in any event is factually inapposite.

28   [104]*Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

issue on appeal would not entitle petitioner to relief on the claim of ineffective assistance of appellate counsel.[105]  In the course of its discussion of the claim of ineffective assistance of trial counsel, the state supreme court held that canvassing Smith pursuant to *Faretta* was not required.[106]  The state supreme court's rejection of this claim for lack of prejudice was neither contrary to nor an unreasonable application of *Strickland*.  Petitioner, who again has the burden of proof on state and federal post-conviction review, has cited no apposite case law holding that a reversal of the conviction was required in the circumstances presented.  His citation generally only to the *Faretta* decision itself does not demonstrate that the Nevada Supreme Court's rejection of his claim was an objectively unreasonable application of *Faretta*.

Ground 9(c) therefore does not provide a basis for federal habeas relief.

**Ground 10: Cumulative Error**

In the remaining claims in Ground 10, petitioner alleges that he was deprived of a fair trial due to cumulative error based upon the claims raised on direct appeal, *i.e.*, in essence, Grounds 1, 2(e), 3, 5 and 7.[107]

The Supreme Court of Nevada rejected this claim on the following grounds:

> . . . Smith alleges that these cumulative errors denied him the right to a fair trial.  We conclude that the issue of innocence or guilt does not appear to be particularly close in light of several State witnesses attesting to Smith's participation.  Balancing this factor against the prejudicial effect of any errors, we conclude that the cumulative effect of any trial errors did not violate Smith's right to a fair trial.

#62, Ex. 187, at 5 (citation footnote omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  Petitioner's claim of cumulative error is no more persuasive as to the

---

[105]#64, Ex. 207, at 12.

[106]See *id.*, at 6-7, quoted, *supra*, at 54-55.

[107]Petitioner dismissed claims of cumulative error based upon claims raised on state post-conviction review after acknowledging that such claims were not exhausted.

-64-

1  claimed errors in the aggregate than the arguments have been in regard to the claimed errors

2  in the singular.  *Accord Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005)("Because we

3  find no merit in [petitioner's] claims of constitutional error . . . , we also reject his contention

4  that he was prejudiced by the cumulative effect of the claimed errors.").

5          Ground 10 therefore does not provide a basis for federal habeas relief.

6          IT THEREFORE IS ORDERED that the remaining claims in the petition for a writ of

7  habeas corpus shall be DENIED on the merits and that this action shall be DISMISSED with

8  prejudice.

9          The Clerk of Court shall enter final judgment accordingly in favor of respondents and

10  against petitioner, dismissing this action with prejudice.

11          DATED:   July 10, 2009

12

13

14

15          _____

16          EDWARD C. REED
          United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28